730 A.2d 352

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. ERIC CALDWELL, DEFENDANT–APPELLANT.

Argued January 20, 1999—Decided June 17, 1999.

*Paul B. Halligan,* Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

*Robert H. Corrado,* Assistant Prosecutor and *Steven E. Braun,* Senior Assistant Prosecutor, argued the cause for respondent (*Ronald S. Fava,* Passaic County Prosecutor, attorney).

*Marcy H. Speiser,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Peter Verniero,* Attorney General, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

In this appeal, we decide whether defendant's motion to suppress evidence seized at the time of his arrest was properly denied. More specifically, we consider whether his seizure by the police violated the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution.

I.

At defendant's suppression hearing, Passaic County Sheriff's Department Detective Anthony Smith testified. He stated that on April 12, 1995, at approximately 9:00 p.m., he received a "beep" from a confidential informant. Detective Smith worked in the Warrant Division of the Sheriff's Department and had received reliable information from that informant over the past four and a half years. The informant told him that Curtis Stuart, who was wanted on a warrant, was standing in front of a multi-unit

dwelling at 86 Butler Street, in Paterson, New Jersey. The informant told the Detective that Mr. Stuart was a black male but could not give a detailed physical description of him because he only "caught a glimpse of his face" and did not notice what type of clothes Mr. Stuart was wearing. Detective Smith had no personal knowledge of what Curtis Stuart looked like; he knew only that he purportedly was a black male standing outside of 86 Butler Street.

Due to the informant's credible history, Detective Smith acted on the tip and checked the active warrant sheet in his patrol car. The active warrant sheet contains all the names of individuals with outstanding warrants. On the night in question, over 1500 names were on the warrant sheet. The check verified that a warrant was outstanding for Curtis Stuart. However, unbeknownst to Detective Smith, the active warrant list was incorrect and the warrant for Curtis Stuart had been vacated ten months earlier on June 7, 1994. The warrant for Stuart was originally issued on June 6, 1994 for his failure to appear for trial. However, Stuart appeared in court the next day and the warrant was vacated. Stuart was eventually sentenced to four years in jail. On the day of defendant's arrest, Stuart had already been incarcerated for five days in the Passaic County Jail.

Acting on the informant's tip and his belief that the active warrant list was correct, Detective Smith proceeded to 86 Butler Street with Sergeant Ferrera and Detective Arcieri in an unmarked police unit. The officers arrived in front of the multi-unit dwelling within five minutes of receiving the page. As their vehicle approached the dwelling, the three officers saw a black male standing alone in front of the building. The black male was later identified as defendant, Eric Caldwell. Detective Smith pulled the vehicle directly in front of 86 Butler Street. When defendant saw the unmarked police car approaching, he turned, looked at them, and ran into the building. The officers exited the vehicle and ran toward the building. Defendant ran up the front steps and was a quarter of the way down the hallway when Detective Smith yelled, "stop, police, ... don't run any more."

Detective Smith testified that he "asked [defendant] to walk towards [his] direction, which [defendant] did." The officers had a clear view of the hallway and could see defendant the entire time.

Defendant immediately stopped upon hearing Detective Smith's command. He turned to face the police officers and, in the process, tossed an object from his right hand. Detective Smith explained at the suppression hearing that, "[a]fter I asked him to stop, he stopped, began to walk toward me and discarded something.... He turned and came—As he turned, I seen (sic) him toss something." The defense attorney specifically asked Detective Smith, "Did he attempt to conceal the throw by any chance? ... Did he do it specifically, overtly or was it a kind of movement to try and discard it without your knowledge?" Detective Smith answered, "Exactly, moving without my knowledge."

The object landed on the hallway floor in plain view of the three officers. Detective Arcieri detained defendant while Detective Smith retrieved the tossed object. Detective Smith found a large plastic bag containing sixty smaller plastic bags of crack cocaine. After retrieving the contraband, the detectives patted down defendant and handcuffed him. The pat-down uncovered seven more plastic bags filled with marijuana and $28 in cash. The officers then placed defendant under arrest and brought him to the squad room for processing.

When asked by the defense attorney why he began to chase defendant, Detective Smith responded, "The reason I chased him was because of the information I received at that time. I observed him as the only male outside of the location, and he turned and ran away from me. Working Warrants, that's what individuals usually do, because they know they are going to jail. They run as soon as they see the car pulling up." The defense attorney continued, "So if another individual had been walking by, you would have chased that individual as well?" Detective Smith responded, "We might have detained him for I.D. purposes." On redirect, the prosecutor asked Detective Smith, "[I]f, when you had stopped Mr. Caldwell, he hadn't thrown the narcotics, pro-

duced identification to show he was Eric Caldwell, what would have happened to him?" The detective answered, "He would have been released right then." .

Defendant was indicted for third degree possession of CDS (cocaine), *N.J.S.A.* 2C:35–10a(1); third degree possession of CDS with intent to distribute within 1000 feet of school property, *N.J.S.A.* 2C:35–5 and 2C:35–7; fourth degree possession of marijuana with intent to distribute, *N.J.S.A.* 2C:35–5a(1) and b(12); and third degree possession of marijuana with intent to distribute within 1000 feet of school property, *N.J.S.A.* 2C:35–7. He moved to suppress the evidence seized at the time of his arrest, contending that he had been subjected to an illegal search and seizure. The trial court, relying on *State v. Tucker,* 136 *N.J.* 158, 642 *A.*2d 401 (1994) and *State v. Novembrino,* 105 *N.J.* 95, 519 *A.*2d 820 (1987), granted defendant's motion to suppress. The State appealed, and the Appellate Division reversed the trial court. On remand, defendant pled guilty to one count of possession of CDS with intent to distribute within a school zone. He was sentenced to four years imprisonment with a two-and-a-half year period of parole ineligibility. Defendant appealed, challenging the excessiveness of the sentence. The Appellate Division affirmed defendant's sentence.

We granted defendant's petition for certification, 156 *N.J.* 386, 718 *A.*2d 1215 (1998), and now reverse.

## II.

The Fourth Amendment of the United States Constitution and Article 1, paragraph 7 of the New Jersey Constitution protect against unreasonable searches and seizures. The Supreme Court has held that even a brief detention can constitute a seizure. *Terry v. Ohio,* 392 *U.S.* 1, 16, 88 *S.Ct.* 1868, 1874, 20 *L.Ed.*2d 889, 903 (1968). "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* In *Terry,* the Court recognized, for the first time, an exception to the requirement that Fourth

Amendment seizures of individuals must be based upon probable cause. The Court explained that the intrusion in *Terry* was so much less severe than that involved in traditional arrests and therefore, it declined to broaden the concept of arrests to include such intrusions. Instead, the Court considered the stop-and-frisk intrusion as falling within the general rubric of police conduct.

> *Terry* departed from the traditional Fourth Amendment analysis in two respects. First, it defined a special category of Fourth Amendment seizures so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment seizures reasonable could be replaced by a balancing test. Second, the application of this balancing test led the Court to approve this narrowly defined less intrusive seizure on grounds less rigorous than probable cause ...
>
> [*Dunaway v. New York,* 442 *U.S.* 200, 209–210, 99 *S.Ct.* 2248, 2254–55, 60 *L.Ed.*2d 824, 833 (1979).]

New Jersey courts have "long recognized that a temporary street detention based on less than probable cause may be constitutional." *State v. Tucker, supra,* 136 *N.J.* at 167, 642 *A.*2d 401; *see also, State v. Davis,* 104 *N.J.* 490, 507, 517 *A.*2d 859 (1986) (holding that "particularized suspicion" that youth was engaged in criminal activity justified seizure.) In *State v. Dickey,* 152 *N.J.* 468, 477, 706 *A.*2d 180 (1998), we held that "when the intrusion on the individual is minimal, and the law enforcement interests outweigh the privacy interests infringed in a *Terry* encounter, a stop based on objectively reasonable and articulable suspicions, rather than upon probable cause, is consistent with the Fourth Amendment."

> The exception to the probable-cause requirement for limited seizures of the person recognized in *Terry* and its progeny rests on a balancing of competing interests to determine the reasonableness of the type of seizure involved within the meaning of "the Fourth Amendment's general proscription against unreasonable searches and seizures." *Id.* at 392 *U.S.* at 20, 88 *S.Ct.* at 1879. We must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. When the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests, the opposing law enforcement interest can support a seizure based on less than probable cause.... The context of a particular law enforcement practice, of course, may affect the determination whether a brief intrusion on Fourth Amendment interests on less than probable cause is essential to effective criminal investigation.

[*United States v. Place*, 462 *U.S.* 696, 703–704, 103 *S.Ct.* 2637, 2642–43, 77 *L.Ed.*2d 110, 118–19 (1983).]

The Supreme Court recognized in *Florida v. Royer*, 460 *U.S.* 491, 506, 103 *S.Ct.* 1319, 1329, 75 *L.Ed.*2d 229, 242 (1983), that "there is [no] litmus-paper test for ... determining when a seizure exceeds the bounds of an investigative stop." Therefore, in *State v. Davis, supra*, 104 *N.J.* at 504, 517 *A.*2d 859, we held that to determine the reasonableness of a specific investigatory stop under New Jersey law, the reviewing court must "evaluate the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be free from unwarranted and/or over-bearing police intrusions." *Ibid.* We recognized that "[n]o mathematical formula exists for deciding whether the totality of circumstances provided the officer with an articulable or particularized suspicion that the individual in question was involved in criminal activity." *Id.* at 505, 517 *A.*2d 859. The reviewing court must conduct a "sensitive appraisal" of the facts and decide if the officer's conduct tipped the constitutional scales in favor of suppression of the evidence. *Ibid.* The reviewing court must decide if the officer's observations, in "view of the officer's experience and knowledge, taken together with rational inferences drawn from those facts," warrant a "limited intrusion upon the individual's freedom." *Id.* at 504, 517 *A.*2d 859.

Against that background, we consider the officers' conduct as revealed by this record. Unquestionably, the officers intended to attempt an investigatory stop of the black male that they observed in front of 86 Butler Street and whom they suspected to be Curtis Stuart. Before any attempt at an investigatory stop occurred, Caldwell turned and ran into the building and down the hallway, pursued by the officers, and stopping only after Detective Smith shouted "stop, police, ... don't run any more." It is clear that when the officers chased defendant into the building, commanding him to "stop," a seizure of defendant occurred, see *U.S. v. Mendenhall*, 446 *U.S.* 544, 554, 100 *S.Ct.* 1870, 1877, 64 *L.Ed.*2d 497, 509 (1980), and that seizure constituted

something more than a limited intrusion on defendant's Fourth Amendment rights. It also is evident that the police did not have sufficient information to justify the degree of intrusion involved.

■ The fatal flaw in the State's position arises from the unwarranted degree of reliance on the informant's tip. Under the totality of circumstances test an informant's "veracity" and "basis of knowledge" are two highly relevant factors. *State v. Zutic*, 155 *N.J.* 103, 110, 713 *A.*2d 1043 (1998) (quoting *State v. Smith*, 155 *N.J.* 83, 93, 713 *A.*2d 1033, *certif. denied*, —— *U.S.* ——, 119 *S.Ct.* 576, 142 *L.Ed.*2d 480 (1998)). Detective Smith offered some support for the informant's veracity when he testified that he had received reliable information from that informant over the past four and a half years. However, an examination of the contents of the tip and the level of detail contained in the information disclose that there is nothing in this record that reflects an adequate basis of knowledge for the informant's tip. The description of the suspect in this case was clearly inadequate. The informant's tip identified the wanted individual only as a "black male in front of 86 Butler Street." The building identified as 86 Butler Street is a multi-unit dwelling in a predominantly black community.

The informant did not give Detective Smith a physical description of the individual. The informant did not describe the individual's height, weight, or the clothing he was wearing. He offered no distinguishing characteristics that would have assisted Detective Smith in making a positive identification of the suspect. The only information the officer possessed concerning the suspect was that he was a black male and that he was at a certain address. The police must have a sufficiently detailed description of the person to be able to identify that person as the suspect named by the informant. Without such a requirement, police could theoretically conduct wide-ranging seizures on the basis of vague general descriptions.

Not only was the informant's information vague, it also was inaccurate. The officers' reliance on the outstanding warrant was misplaced. The trial court that issued the warrant on June 6,

1994, vacated it the very next day. The information about the status of the warrant was never communicated to the recordkeeping entity of the Sheriff's Department. As a result, the warrant was over ten months old and Curtis Stuart had been incarcerated for five days when Detective Smith mistakenly identified defendant as Stuart.

Detective Smith's testimony that he would have apprehended any black male standing at or near 86 Butler Street, combined with his reliance on a ten month old stale warrant and on a vague tip that a black male was standing in front of a multi-unit apartment complex, provided insufficient circumstances to justify the degree of intrusion involved. Here, as in *Tucker*, what again began as a minimally intrusive stop escalated into a seizure more intrusive than the limited information possessed by the officers would support. *Tucker, supra,* 136 *N.J.* at 173, 642 *A.*2d 401. Hence, the contraband discarded after the seizure must be suppressed.

Law enforcement officials must be encouraged to act reasonably and to trust their professional judgment without fear that hindsight analysis may eradicate their work despite their objectivity. We have consistently held that an evaluating court "must give weight to 'the officer's knowledge and experience' as well as 'rational inferences that could be drawn from the facts objectively and reasonably viewed in light of the officer's expertise." *State v. Arthur,* 149 *N.J.* 1, 10–11, 691 *A.*2d 808 (1997). Nevertheless, this Court is committed to the protection of individuals from unreasonable searches and seizures. *Smith, supra,* 155 *N.J.* at 100, 713 *A.*2d 1033; *Novembrino, supra,* 105 *N.J.* at 107, 519 *A.*2d 820. A study of the record discloses that the police detention of defendant was more than minimally intrusive and insufficiently supported by information demonstrating a reasonable likelihood that defendant was the fugitive whom the police were seeking. Accordingly, the evidence must be suppressed.

The judgment of the Appellate Division is reversed and the case is remanded for further proceedings consistent with this opinion.

HANDLER, J., concurring.

I am in accord with the Court's determination that the police did not have sufficient information to justify the degree of intrusion involved. *See ante* at 461, 730 *A*.2d at 357. Accordingly, I concur in the Court's disposition of this appeal and agree that defendant's motion to suppress must be granted. I write separately because I take issue with the Court's holding in two respects. First, the majority opinion obscures the distinction between investigatory stops and arrests, and between the discrete levels of knowledge needed to justify those respective intrusions. I believe that defendant discarded the contraband he now seeks to suppress pursuant to an investigatory stop. Therefore, the initial detention of defendant must have been justified only by a reasonable and articulable suspicion that defendant was engaged in criminal activity; it need not have been supported by probable cause. The majority opinion is not clear on this issue. More importantly, I emphasize that the officers in this case acted only on an informant's tip that a "black man standing outside 86 Butler Street" was wanted on a warrant. That information was not sufficiently descriptive to provide an adequate basis for the investigatory stop.

I

Preliminarily, I note that this was not a case where probable cause was required. What must be clarified is that the detention of defendant was an investigatory stop.

A person is "seized" in a Fourth Amendment context when, "by means of physical force or a show of authority, his freedom or movement is restrained" and "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 *U.S.* 544, 553–54, 100 *S.Ct.* 1870, 1877, 64 *L.Ed.*2d 497, 509 (1980). That understanding of "seizure" is central to the provisions of the New Jersey Constitution that prohibit unreasonable searches and

seizures. *See State v. Tucker*, 136 *N.J.* 158, 164, 642 *A*.2d 401 (1994); *State v. Davis*, 104 *N.J.* 490, 498, 517 *A*.2d 859 (1986).

In certain circumstances, police are justified in conducting seizures or searches on a basis of knowledge less than probable cause for arrest, so long as those searches and seizures are correspondingly limited in scope and "do not rise to the level of full arrests." *State v. Dickey*, 152 *N.J.* 468, 477, 706 *A*.2d 180 (1998); *see Terry v. Ohio*, 392 *U.S.* 1, 20–22, 88 *S.Ct.* 1868, 1880–81, 20 *L.Ed.*2d 889, 905–06 (1968); *Davis, supra*, 104 *N.J.* at 500, 517 *A*.2d 859. An investigatory stop is such a seizure. *See Terry, supra*, 392 *U.S.* at 16, 88 *S.Ct.* at 1877, 20 *L.Ed.*2d at 903. A frisk or pat-down for weapons as part of an investigatory stop is such a search. *See State v. Arthur*, 149 *N.J.* 1, 8, 691 *A*.2d 808 (1997).

The reasonableness of an investigatory stop and an attendant protective search are related, but distinct, inquiries. *See State v. Thomas*, 110 *N.J.* 673, 678–79, 542 *A*.2d 912 (1988) ("[W]hether there is good cause for an officer to make a protective search incident to an investigatory stop is a question separate from whether it was permissible to stop the suspect in the first place."). We must first consider whether the initial stop was justified, and then assess whether the subsequent search "was 'reasonably related in scope to the circumstances which justified the interference in the first place.' " *Dickey, supra*, 152 *N.J.* at 476, 706 *A*.2d 180 (quoting *Terry, supra*, 392 *U.S.* at 20, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905). In *Dickey*, we considered solely the question of whether the detention of a motorist pursuant to a traffic stop was reasonably related in scope to the circumstances justifying the interference. *Ibid.* In the present case, the focus should be on whether the officers' action was justified at the outset.

An investigatory stop need not be supported by probable cause, but " 'must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity.' " *Davis, supra*, 104 *N.J.* at 500–01, 517 *A*.2d 859 (quoting *United States v. Cortez*, 449 *U.S.* 411, 417, 101 *S.Ct.* 690, 694, 66 *L.Ed.*2d 621, 628 (1981)). "Based upon [the] whole picture the detaining

officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez, supra,* 449 *U.S.* at 418, 101 *S.Ct.* at 695, 66 *L.Ed.*2d at 629; *see United States v. Brignoni–Ponce,* 422 *U.S.* 873, 878, 95 *S.Ct.* 2574, 2578, 45 *L.Ed.*2d 607, 614 (1975); *Adams v. Williams,* 407 *U.S.* 143, 145–46, 92 *S.Ct.* 1921, 1923, 32 *L.Ed.*2d 612, 616–17 (1972); *State v. Citarella,* 154 *N.J.* 272, 279, 712 *A.*2d 1096 (1998); *Arthur, supra,* 149 *N.J.* at 8, 691 *A.*2d 808; *Thomas, supra,* 110 *N.J.* at 678, 542 *A.*2d 912.

The police, however, may not "seek to verify their suspicions by means that approach the conditions of arrest." *Florida v. Royer,* 460 *U.S.* 491, 499, 103 *S.Ct.* 1319, 1325, 75 *L.Ed.*2d 229, 237 (1983); *see Dunaway v. New York,* 442 *U.S.* 200, 216, 99 *S.Ct.* 2248, 2258, 60 *L.Ed.*2d 824, 838 (1979) (holding custodial interrogation exceeded scope of investigation justifiable by reasonable suspicion). When the conduct of the detaining officers exceeds that appropriate for a reasonable investigatory stop, such that the "detention is the functional equivalent of an arrest," the action must then be based on probable cause. *Dickey, supra,* 152 *N.J.* at 478, 706 *A.*2d 180. In the absence of probable cause, "the investigation for which the stop was made may amount to an illegal arrest if the stop is more than 'minimally intrusive.' " *Ibid.* Similarly, if a search incidental to an investigatory stop exceeds a protective patdown or frisk necessary for the safety of the officers, it must be based on probable cause. *See Arthur, supra,* 149 *N.J.* at 14–15, 691 *A.*2d 808 (holding officers' observation of possible drug transaction could not, alone, justify a protective search where officers did not believe defendant was armed and dangerous).

In this case, the record discloses that the officers arrived at 86 Butler Street in an unmarked sedan with the intention of arresting Curtis Stuart on an outstanding warrant. They were looking for a black male suspect at that location. They saw a black man. The black man ran from the front of the building into a hallway, with the officers in pursuit, yelling "stop, police, . . . don't run anymore." Defendant complied. The officers then asked defendant

to walk towards them. As defendant turned to face the officers, he tossed away the evidence he now seeks to suppress. One of the detectives retrieved the discard, which resembled and was. later proved to be crack cocaine.

The majority opinion characterizes these events as "a minimally intrusive stop escalat[ing] into a seizure more intrusive than the limited information possessed by the officers would support." *Ante* at 461, 730 *A.*2d at 357 (citing *Tucker, supra,* 136 *N.J.* at 173, 642 *A.*2d 401). In the majority's words, "[w]hen the officers chased defendant into the building, commanding him to 'stop,' a seizure of defendant occurred, and that seizure constituted something more than a limited intrusion on defendant's Fourth Amendment rights." *Id.* at 459, 730 *A.*2d at 357 (citation omitted). The Court's opinion should not be read to imply that such conduct effectuated an arrest.

Although there is no set rule for " 'determining when a seizure exceeds the bounds of an investigative stop,' " *Dickey, supra,* 152 *N.J.* at 476, 706 *A.*2d 180 (quoting *Royer, supra,* 460 *U.S.* at 506, 103 *S.Ct.* at 1329, 75 *L.Ed.*2d at 242), previous cases in which the Court has assessed the reasonableness of a police detention according to *Terry* standards plainly demonstrate that, although the intended result of the detention here was an arrest on an outstanding warrant, the officers' conduct in ordering defendant to stop and walk towards them was not overly intrusive. In *Tucker, supra,* 136 *N.J.* at 173, 642 *A.*2d 401, the court considered a situation in which police blockaded a fleeing suspect in a residential backyard to be an investigatory stop, eventually finding the stop unlawful because it was based on less than a reasonable suspicion. And in *Davis, supra,* 104 *N.J.* at 495–96, 517 *A.*2d 859, this Court reviewed the conduct of an officer who blocked a bicycling defendant's path with his car as an investigatory detention. In contrast, the detention we found more than "minimally intrusive" in *Dickey, supra,* involved a situation in which the defendants "were removed from the place of the original detention, handcuffed as they were transported in a police car, albeit

voluntarily, to the police station, handcuffed at times in the stationhouse, and told that they were not free to leave." 152 *N.J.* at 482, 706 *A.*2d 180.

The officers' pursuit of defendant and order to stop in this case does not exceed the police action in *Tucker* or *Davis,* which this Court interpreted as investigatory and evaluated according to a reasonable suspicion standard. The conduct at issue here is a far cry from that found to exceed *Terry* bounds in *Dickey, supra. See ibid.; see also State v. Smith,* 155 *N.J.* 83, 713 *A.*2d 1033 (1998) (holding *Terry* standard exceeded by overly intrusive search of defendant's person); *State v. Zutic,* 155 *N.J.* 103, 713 *A.*2d 1043 (1998) (same). Although the Court's opinion suggests that such conduct was tantamount to an arrest, it is clear that this was not a *de facto* arrest. Indeed, the majority opinion never states that probable cause was required. The fact that the officers were attempting to execute an arrest warrant does not itself convert their stop of defendant into an arrest. The officers initially sought to arrest Curtis Stuart—not Eric Caldwell. Hence, to execute the warrant, some investigation would have been necessary to establish the identity of the detained individual. Accordingly, when the officers ordered Caldwell to "stop," that was to ascertain his identity; he was subjected to an investigatory detention. *See Mendenhall, supra,* 446 *U.S.* at 553–54, 100 *S.Ct.* at 1877, 64 *L.Ed.*2d at 509; *Davis, supra,* 104 *N.J.* at 498, 517 *A.*2d 859. Therefore, the basic question remains whether the police had a reasonable, objective and particularized suspicion that the person they stopped had engaged, or was about to engage, in criminal activity.

## II

The majority is right that "Detective Smith's testimony that he would have apprehended any black male standing at or near 86 Butler Street, combined with his reliance on a ten month old state warrant and on a vague tip that a black male was standing in front of a multi-unit apartment complex, provided insufficient circum-

stances to justify the degree of intrusion involved." *Id.* at 461, 730 *A.*2d at 357. But let us be clear: the circumstances in this case did not provide the officers with information adequate to form the reasonable, objective and particularized suspicion necessary to justify the investigatory stop.

A descriptive tip by an informant may contribute to a reasonable, objective and particularized suspicion sufficient to serve as the basis for an investigatory stop. *See Alabama v. White,* 496 *U.S.* 325, 330, 110 *S.Ct.* 2412, 2416, 110 *L.Ed.*2d 301, 309 (1990); *Adams, supra,* 407 *U.S.* at 147, 92 *S. Ct* at 1924, 32 *L.Ed.*2d at 617–18; *Zutic, supra,* 155 *N.J.* at 113, 713 *A.*2d 1043. A valid arrest warrant can be the basis for an investigatory stop as well; the warrant would support a "reasonable suspicion" that the person named in the warrant committed a crime. *See United States v. Hensley,* 469 *U.S.* 221, 232, 105 *S.Ct.* 675, 682, 83 *L.Ed.*2d 604, 614–15 (1985). Accordingly, in many circumstances officers may be justified in conducting an investigatory stop to check identity pursuant to an informant's descriptive tip of a suspect wanted on an outstanding warrant. The tip, however, must carry "indicia of reliability" that justify the stop. *Adams, supra,* 407 *U.S.* at 147, 92 *S.Ct.* at 1923, 32 *L.Ed.*2d at 617–18. And there must be some objectively reasonable basis for believing the detainee is the person named in the warrant. *See People v. Vasquez,* 108 *A.D.*2d 701, 485 *N.Y.S.*2d 1008, 1010 (1985) (holding where individual matches general description of person named in warrant, "[t]he minimal intrusion of approaching to request information is permissible"). The critical question, however, is whether there is a reasonable basis to surmise that the person stopped is the person named in the warrant and, therefore, the suspect.

In the circumstances of this case, neither the informant's tip nor the warrant, alone or in combination, justified the interference. Detective Smith testified that he proceeded to 86 Butler Street solely on the basis of the arrest warrant and the tip. Given that the officers had never seen Stuart before, they would have been able to identify the object of their investigation only by using the

description given by the informant. That description consisted simply of the suspect's skin color and gender. The informant did not describe the clothes worn by the individual believed to be Stuart; the tip did not provide any information regarding other characteristics of the wanted individual; the tip did not inform the officers as to whether Stuart was alone or in a group. Rather, the tip merely informed the officers that Curtis Stuart, a black man wanted on an outstanding warrant, was outside of 86 Butler Street. Accordingly, when the officers, not otherwise familiar with Curtis Stuart, arrived at 86 Butler Street, they were looking only for a black man.

Such a minimal description in this constitutional context is descriptive of nothing, and is void of underlying facts capable of corroboration sufficient to generate the level of reliability necessary to insure a reasonable investigatory stop. *Cf. Thomas, supra,* 110 *N.J.* at 683, 542 *A.*2d 912 (holding tip that "a man named Ike, dressed in a plaid cap, tan jacket, and wearing gold frame glasses, was in possession of illegal drugs inside the Shangri La Bar at 265 Passaic Street," when corroborated by officer justified investigatory stop); *State v. Sharpless,* 314 *N.J.Super.* 440, 449, 715 *A.*2d 333 (App.Div.) (holding tip "that someone had seen a black man wearing a green jacket with a hood armed with a handgun in the area of Atkins Avenue and Adams Street" justified stop), *certif. denied,* 157 *N.J.* 542, 724 *A.*2d 802 (1998).

Race alone is not a specific and articulable fact sufficient to establish the reasonable, particularized suspicion needed for an investigatory stop of a defendant. Adding gender to race does not augment the description of the suspect so that he could fairly be picked out by officers intending to investigate.

In addition, the "location" of the underdescribed suspect in these circumstances adds nothing to the reliability of the tip or to the facts necessary to establish particularized suspicion. The "black male" the officers were looking for was said to be standing outside of a multi-unit dwelling in a predominantly black community. Moreover, an untold number of residents of urban Paterson

could also have passed by that location between the time the officers received the tip and their arrival at 86 Butler Street approximately five minutes later. One may reach this conclusion even discarding as unreliable the statement of Ricky Williams, who testified that he, also a black man, was standing a "couple of feet" from 86 Butler Street when the officers arrived. In these circumstances, the informant's tip could not have provided the officers with a reasonable basis for believing that Caldwell was Stuart. *Cf. Hill v. California*, 401 *U.S.* 797, 803–04, 91 *S.Ct.* 1106, 1110–11, 28 *L.Ed.*2d 484, 489–90 (1971) (upholding arrest of defendant and fruits of attendant search pursuant to valid arrest warrant for another person as reasonable mistake).

The fact that the officer relied on a "ten month old stale warrant," *ante* at 461, 730 *A.*2d at 357, also denigrates the validity of the stop. But even if the warrant had been current, the police officers must still have had a reasonable and articulable suspicion that the man they seized was Curtis Stuart. Without that hurdle, officers would be given free reign to seize and question individuals who match scant specifications of warrants. This is too wide a net to cast when the dignity and liberty of individuals are at stake.

Given that neither the informant's tip nor the warrant justified the interference, defendant's flight upon the officer's arrival has little bearing. Flight may enhance an "already existing reasonable articulable suspicion." *Citarella, supra,* 154 *N.J.* at 281, 712 *A.*2d 1096. But the flight of defendant alone, unfounded on other articulable bases for suspicion of criminal activity, does not meet the *Terry* standard. *See Tucker, supra,* 136 *N.J.* at 173, 642 *A.*2d 401.

The conclusion that the totality of the circumstances did not provide the officers with "an articulable or particularized suspicion that the individual in question was involved in criminal activity," *Cortez, supra,* 449 *U.S.* at 417, 101 *S.Ct.* at 695, 66 *L.Ed.*2d at 629, is unavoidable.

## III

In my opinion, the motion to suppress must be granted because the investigatory detention of Caldwell was not based upon a reasonable and articulable suspicion that Caldwell was guilty of a crime. For that reason, I concur in the judgment of the Court.

Chief Justice PORITZ and Justice COLEMAN join in this opinion.

Chief Justice PORITZ and Justices HANDLER and COLEMAN, concur in result.

*For reversal and remandment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—none.