**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1935-24

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

BRAZHON J. LEWER,

     Defendant-Appellant.

_____

Argued April 27, 2026 – Decided May 12, 2026

Before Judges Sabatino and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 23-11-0811.

Zachary G. Markarian, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Zachary G. Markarian, of counsel and on the briefs).

Thomas M. Caroccia, Deputy Attorney General, argued the cause for respondent (Jennifer Davenport, Attorney General, attorney; Thomas M. Caroccia, of counsel and on the brief).

PER CURIAM

Following the denial of his motion to suppress, defendant Brazhon J. Lewer pled guilty to second-degree possession of a handgun by a certain person not to have a weapon, N.J.S.A. 2C:39-7(b)(1), and was sentenced to eight years in prison. Defendant appeals from the February 2, 2024 order denying his motion and his resulting judgment of conviction. We affirm.

I.

Defendant moved to suppress a handgun seized from a search incident to his arrest. The court conducted evidentiary hearings on January 29 and February 2, 2024, from which we discern the relevant facts.

At the January 29, 2024 hearing, Officer Fabrice Veloso, a detective in the Hillside Police Department, testified to the events leading to defendant's arrest on the evening of October 29, 2021. Veloso stated that at or around 9:39 p.m., while patrolling in a marked police vehicle with his partner, Officer Amadeu Fernandes Dacruz, he received a call from radio dispatch relaying a 9-1-1 call reporting "there [were] two black males attempting to gain access into vehicles by flipping door handles" in a nearby convenience store parking lot. He testified dispatch clarified that the call described the two individuals as two

black males, "one [of whom] was wearing all black" including a black mask, but provided no additional details about the other individual.[1]

Officer Veloso testified that because the 9-1-1 caller followed the individuals, the radio dispatch provided contemporaneous updates of where they were headed, namely "that the two black males [were] proceeding . . . south" through the parking lot of a neighboring business, then walking east on a nearby street.[2] After Veloso and his partner approached "the immediate area, . . . [they] encountered . . . the 9-1-1 caller," who, as noted, had "followed the suspects until he saw police response." He stated that the caller confirmed dispatch's description of the entirety of the call and that the caller stated he "observed two black males, one specifically wearing all black, attempting to gain access to vehicles by flipping the door handles."

---

[1] At the February 2 evidentiary hearing, the State played the initial radio dispatch, which stated "[c]aller states there's two black males that were trying door handles at one of the . . . convenience stores. . . . One is dressed in all black, wearing a black mask." The dispatch also conveys the direction and street on which the individuals were walking.

[2] We note the audio recording of the dispatch and computer-aided dispatch (CAD) report both included in the record before us confirm Officer Veloso's testimony regarding dispatch's contemporaneous location updates.

Officer Veloso then testified that while he was speaking to the caller, Officer Treniece Avent, another nearby officer responding to the radio dispatch, "tried to conduct a field stop on two males" who matched the description and were walking in the direction and manner consistent with the dispatch's updates. After receiving notice over radio that the two individuals "were running" from Officer Avent, Officer Veloso explained he drove away from the convenience store toward the street on which Officer Avent had initiated her stop, when he quickly observed Officer Javier Rodriguez, another nearby officer, "running on foot in the street" after one of the individuals. Officer Veloso testified, at that point, he pursued the individual that Officer Rodriguez was chasing, "got out of [his] vehicle, identified [him]sel[f], and told the suspect to stop running." After a short foot pursuit over less than half a block, Officer Veloso stated he and Officer Dacruz apprehended the individual in a residential area where no one else "was walking around outdoors."

After apprehending the individual, now defendant before us, Officer Veloso testified the responding officers arrested him and searched him incident to the arrest where they found a "black Glock handgun." He stated the entire encounter from when he received notice from the radio dispatch to defendant's arrest took between "three to five minutes." On a map of the area around the

4

convenience store provided by the State, Officer Veloso identified and marked where the convenience store was located, where he observed Officer Rodriguez, where he understood Officer Avent to have first interacted with the individuals, and the area where defendant was arrested and searched. The entire interaction occurred within a two-block radius of the convenience store. Officer Veloso also explained he was extremely familiar with the area in which this encounter occurred and stated there was no one else in the immediate area at the time of the incident.

The State also introduced the body-worn camera (BWC) footage of Officer Dacruz, which corroborated the testimony from Officer Veloso.[3] Specifically, the BWC footage confirmed his testimony that Officer Avent stated the suspects were running, his short pursuit of defendant, as well as the conversation with the 9-1-1 caller, in which the caller, who indicated he has prior work experience in law enforcement, described the suspects and their unsuccessful attempts to "pull on the door handles" of several "locked cars." The State also used the BWC footage to refresh his memory that defendant at the time of his arrest was wearing a "light-colored sweatshirt" and a mask. He

---

[3] With respect to Officer Dacruz's BWC, we have considered the parties' post-argument supplemental submissions addressing the contents of the video footage.

also testified that Officer Avent's initial stop, which should have been recorded by her BWC pursuant to their department's guidelines, was not.

After the conclusion of Officer Veloso's testimony, the court decided it was necessary to continue the hearing because it had "an incomplete record, and [could] not make an informed decision as to whether there [was] a basis for the stop in this particular situation." The court stated there was, at the least, a field stop and arrest, but it "need[ed] somebody from [the] scene" to give details such as "whether it was completely a stop; whether [suspects] stopped to talk to [an officer], and started to, and they ran; [and] whether [the officers] just got out of their car and they ran."

At the subsequent February 2 hearing, the court heard testimony from Officer Rodriguez then Officer Avent, as "officers who . . . actually observed [defendant] and allegedly another individual," prior to the arrest. Officer Rodriguez testified that around 9:40 p.m. on October 29, 2021, he responded to the radio dispatch as "backup" for Officer Avent, who he understood had already "initiated the actual stop" of the suspects. As he approached Officer Avent's location in an unmarked vehicle, he observed the individuals were "running already," at which point, he exited his vehicle and "commenced a foot pursuit." He testified he chased "one of the males [wearing] a gray . . . hoodie with a face

mask," and noticed the other individual, who was dressed in all black, "ran behind [him]." As he ran, he noticed Officers Veloso and Dacruz and observed they "were able to apprehend" the individual in the grey hoodie, but not the individual dressed in all black. The court also played Officer Rodriguez's BWC footage, which corroborated his testimony.

Officer Avent also testified and explained that she responded to the original radio dispatch and observed two individuals matching the radio dispatch's description walking away from the convenience store. She testified the radio dispatch described the suspects as two black males, one of whom was wearing all black. After having her memory refreshed with the CAD report from the incident, she confirmed that the dispatch also noted the individual wearing all black was reported wearing a black mask.[4]

Acting on this information, Officer Avent testified she "drove around looking in the area for the individuals that would fit the description" when she observed two individuals, one of whom was dressed in all black and both

---

[4] The CAD report describes the initial radio dispatch as conveying "[two] black males trying door handles in [the] parking lot of [the convenience store], . . . [one] male all black wearing black mask."

wearing masks.[5]  She testified no one else was in the area.  She stated she attempted to initiate a "field inquiry" with the individuals but later testified her initial interaction was likely an "investigatory stop."  She further testified she did, in fact, get out of the car and attempt to ask the individuals where they were going but later clarified she "did not think [she] got out the car" and "probably rolled down the window, and asked them a question, and then . . . [she] got out the car, and that is when they started running."

Officer Avent acknowledged department and Attorney General policies required her to activate her BWC for certain encounters with the public.  She testified she did not activate her camera until after the individuals began running because "[e]verything happened so quick[ly]" over the course of only a few minutes.  Officer Avent also testified she participated in detaining a second individual, after defendant was arrested, who was later released after not being identified as a suspect.  Her testimony was supplemented by the playback of her

---

[5] Although the initial dispatch does not indicate whether defendant was wearing a mask, Officer Dacruz's BWC footage confirms defendant was, in fact, wearing a mask when he was apprehended.

BWC footage, which confirmed the sequence of events after the individuals had already fled.[6]

After the officers' testimony, the State argued the motion to suppress should be denied because Officer Avent "had more than reasonable suspicion at that point to conduct an investigatory stop . . . ." It contended Officer Avent observed two individuals, one of which matched the radio dispatch description exactly, and encountered no other individuals in the area near the convenience store. It further contended this encounter occurred in "a very short distance over a very short period of time."

Defendant asserted Officer Avent did not have reasonable suspicion because "the only reason to stop would have been . . . he is a black male." He contended defendant did not match the description from the 9-1-1 call beyond his race and gender and asserted Officer Avent's testimony could not be "corroborated" because of her violation of the BWC policy. He further asserted the 9-1-1 call itself could not be corroborated because it was similarly not properly preserved "with no response from the State as to how that happened."

---

[6] Officer Avent's BWC footage confirms that, immediately after defendant was arrested, she announced over the radio to the other responding officers that "there was another [individual] with a black hoodie and a black mask."

A-1935-24

After considering the officers' testimony and parties' oral arguments, the court issued an oral decision. The court agreed with defendant that the State's failure to preserve the 9-1-1 call and Officer Avent's failure to turn on her BWC were "violations of the policy," to which defendant was entitled "to an adverse inference on that violation . . . by statute." The court, however, concluded such violations did not "change [its] findings of fact in this case." It explained it "may not have the 9-1-1 call, but [it has] the actual 9-1-1 caller on BWC giving information in real time," immediately followed by Officer Avent's transmission that the suspects were fleeing. The court found the entire encounter from transmission to defendant's arrest was "three to five minutes," which made it "one of the quickest responses this [c]ourt ha[d] seen."

The court concluded what defendant was wearing "did not matter" because he "happen[ed] to be with the person [who matched] the very specific description" and was "one of two people who just came around the corner from where a crime had been attempted to be committed." The court also found persuasive the proximity of the convenience store to where defendant was initially stopped and later arrested. It decided defendant's attempt to flee constituted "an investigative detention that prompted a probable cause-based arrest for violating the obstruction or resisting statute." The court found the

10

officers also had probable cause for attempted burglary, but, in any event, the officers "had probable cause for arrest, and search incident to arrest."

Regarding the credibility of the officers, the court found all three "to be extremely credible" and noted Officer Veloso provided a detailed and thorough description of "the whole scenario, given his response time, and his interviews, both with the 9-1-1 caller and his apprehension of the suspect." He also found "no reason to doubt Officer Avent's testimony that they were the only individuals on the street, and . . . at least one fit the description."

Later that day, the court issued a corresponding order supplemented by a February 21, 2024 written decision denying defendant's motion to suppress the evidence in the instant case. In its written decision, the court found "there is no question that Officer Avent had a reasonable and articulable suspicion to stop defendant and the man with whom he was walking." The court found the facts that the 9-1-1 caller followed the suspects around the corner and Officer Avent "almost simultaneously" observed two men matching the description walking down an empty nearby street were "sufficient to conduct an investigative detention." The court rejected defendant's argument that he was racially profiled as "there [was] nothing in the record to support that assertion," especially in light of the immediateness of the officers' response.

11

The court further found that Officer Avent's initial interaction with defendant was, indeed, an investigatory stop, notwithstanding the fact that she did not clarify "the manner in which she pulled up next to them and asked where they were going." The court decided whether it was a "completed stop" was "of no moment" in light of its conclusion that Officer Avent had reasonable suspicion that the two men "were involved in the attempted theft." It further found defendant's flight after the stop was initiated "gave rise to probable cause to arrest for the attempted burglary as well as obstruction . . . ."

With respect to the missing 9-1-1 call, the court determined "it is clear . . . defendant was not prejudiced by the loss or destruction of this evidence." It found the only relevant information was what the officers knew at the time Officer Avent had initiated the stop, which included the report that two individuals attempted to break into cars near a convenience store and that one was wearing all black and a black mask. The court also noted the officers personally spoke with the caller, who provided "the exact same information, confirming that dispatch's message was an accurate description of the 9-1-1 call."

12

II.

Before us, defendant argues Officer Avent did not have reasonable suspicion when she initiated an investigatory stop because she detained him "based only on the dispatch that two black men had been seen pulling car door handles." He asserts Officer Avent relied on a 9-1-1 call from an "unknown amount timer earlier" where the caller "reported seeing two black men 'pulling on [car] door handles'" and one of the two men was "wearing black clothing and a mask." He contends Officer Avent's actions constituted an "investigatory detention" when she "stop[ed] her marked police car next to [defendant], question[ed] him about his direction of travel, and g[ot] out of her car to further interact with him."

Defendant further maintains New Jersey precedent support his contention that Officer Avent did not possess reasonable suspicion. Notably, he cites State v. Caldwell, 158 N.J. 452 (1999) and State v. Nyema, 249 N.J. 509 (2022), for the proposition that the information known by Officer Avent at the time of her detention "was just as generic as that known by the officers in Caldwell [and] Nyema."

Further, defendant contends the behavior described on the call did not constitute nor suggest criminal activity and maintains "police must take care to

avoid acting on the basis of a 9-1-1 call motivated by racial prejudice." Defendant asserts officers could not have inferred any criminal activity "without more information about what the caller had observed." He asserts "the somewhat generic information provided in the 9-1-1 call was [not] 'simply one piece of the puzzle.'" (quoting State v. Gamble, 218 N.J. 412 (2014)).

Next, defendant contends Officer Dacruz did not have probable cause to "escalate[] the encounter into an arrest when he tackled and handcuffed [defendant], then comprehensively searched his person," as his conduct was based "on the same facts known to [Officer] Avent." He asserts the "only additional detail" of which he was aware at the time of the arrest was defendant's flight, which was not "was not enough to provide Dacruz with probable cause to arrest [defendant]." Defendant contends our "courts have recognized time and again that many law-abiding citizens dread and seek to avoid police encounters, causing them to react in a variety of ways when they become the focus of police attention." Defendant argues State v. Dangerfield, 171 N.J. 446 (2002) supports his assertion that merely fleeing from officers does not constitute probable cause to effectuate an arrest.

Finally, defendant contends a remand is necessary because the court "failed to apply the rebuttable presumption that exculpatory evidence was

destroyed or not captured in favor of a criminal defendant when Officer Avent failed to activate her body worn camera prior to initiating the stop." (internal quotation marks omitted). Defendant argues proper application of the rebuttable presumption established by N.J.S.A. 40A:14-118.5(q) "would have undermined [Officer Avent's] testimony that [defendant] was walking with a person matching the description." Defendant asserts he raised this issue when he "could not confirm whether Avent had seen [him] with 'someone that could have matched th[e] description' of a black man wearing dark clothing." We disagree with all of defendant's arguments.

III.

We begin our analysis by reciting the appropriate standard of review, followed by the applicable substantive constitutional legal principles that inform and guide our analysis. Our review of a trial court's decision on a motion to suppress is limited. State v. Ahmad, 246 N.J. 592, 609 (2021). We will defer to the trial court's factual findings so long as they are supported by sufficient evidence in the record, setting them aside only when "clearly mistaken." State v. Caneiro, 262 N.J. 288, 300 (2025). The trial court's legal interpretations, however, are reviewed de novo. Ibid.

A.

Both the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, "guarantee individuals the right to be free from unreasonable searches and seizures." State v. Carter, 247 N.J. 488, 524 (2021). In recognition of that right, warrantless searches and seizures are held to be presumptively invalid. State v. Rosario, 229 N.J. 263, 271 (2017) (citing State v. Elders, 192 N.J. 224, 246 (2007)).

However, "[n]ot all police-citizen encounters constitute searches or seizures for purposes of the warrant requirement." Rosario, 229 N.J. at 271 (quoting State v. Rodriguez, 172 N.J. 117, 125 (2002)). A field inquiry, for example, is "essentially a voluntary encounter," in which an individual is not compelled to answer, or even listen to, police questions. Ibid. Such encounters need not be proceeded by any "particular suspicion of criminal activity," but are valid only if the defendant, "under all of the attendant circumstances, reasonably believed he could walk away without answering." Id. at 272 (first quoting Elders, 192 N.J. at 246; and then quoting State v. Maryland, 167 N.J. 471, 483 (2001)).

In contrast, an investigative detention or "Terry stop,"[7] is a "temporary seizure" that occurs when "'an objectively reasonable person' would feel 'that his or her right to move has been restricted.'" Ibid. (quoting Rodriguez, 172 N.J. at 126). Such stops must be "brief and narrowly circumscribed" and the "intrusion on the individual [must be] minimal." State v. Dickey, 152 N.J. 468, 477 (1998). They must last no longer and be no more intrusive than necessary to effectuate "the purpose that justified the stop in the first place." State v. Shaw, 237 N.J. 588, 612 (2019). Provided these criteria are met, police may conduct an investigative detention based on objectively "reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in, criminal activity." Rosario, 229 N.J. at 263 (quoting State v. Stovall, 170 N.J. 346, 356 (2002)).

An investigatory stop does not offend the federal or state constitutions "if it is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." Nyema, 249 N.J. at 527 (quoting Rodriguez, 172 N.J. at 126). "Determining whether reasonable and articulable suspicion exists for an investigatory stop is a highly fact-intensive inquiry." Id. at 528. Courts must

---

[7] Terry v. Ohio, 392 U.S. 1 (1968).

A-1935-24

evaluate "the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions." Ibid. (quoting State v. Privott, 203 N.J. 16, 25-26 (2010)). "[P]roximity in terms of time and place can certainly be factors in determining whether reasonable suspicion existed." Id. at 534.

Where, as here, an "anonymous tip is conveyed through a 9-1-1 call and contains sufficient information to trigger public safety concerns and to provide an ability to identify the person, a police officer may undertake an investigatory stop of that individual." State v. Gamble, 218 N.J. 412, 429 (2014). That is because courts treat anonymous 9-1-1 calls as more reliable than other anonymous tips, owing to "technological and regulatory features of the 9-1-1 system which safeguard against false reports." Id. at 430; see also United States v. Brown, 448 F.3d 239, 247 (3d Cir. 2006) (stating "[t]he fact that 'every detail provided [in a description] matched the details observed by the officers' can contribute to a finding of reasonable suspicion" (quoting United States v. Nelson, 284 F.3d 472, 483 (3d Cir. 2002))).

Further, "information imparted by a citizen directly to a police officer will receive greater weight than information received from an anonymous tipster."

18

State v. Basil, 202 N.J. 570, 586 (2010). "Thus, an objectively reasonable police officer may assume that an ordinary citizen reporting a crime, which the citizen purports to have observed, is providing reliable information." Ibid. This is so because "we assume that an ordinary citizen 'is motivated by factors that are consistent with law enforcement goals,'" ibid. (quoting State v. Davis, 104 N.J. 490, 506 (1986)), and thus may be regarded as trustworthy, State v. Hathaway, 222 N.J. 453, 471 (2015).

Our Supreme Court has made clear, however, that a description of the race and gender of a criminal suspect, without more, is insufficient information to effectuate an investigatory stop. Nyema, 249 N.J. at 531. Specifically, when the police act on information provided by a 9-1-1 caller or an informant, the description must provide information beyond the suspect's race and gender, such as the suspect's approximate height, weight, age, clothing worn, "or any other identifying feature that would differentiate the two Black male suspects from any other Black men in New Jersey." Ibid.; see also Caldwell, 158 N.J. at 454-55 (invalidating an investigatory stop based on a tip from an informant who told police that there [were] a black man standing in front of a building). In that regard, the Court has explained that "vague" descriptions of race and gender are "'descriptive of nothing'" and insufficient to effectuate an investigatory stop

without more.  See id. at 533-34 (quoting Caldwell, 158 N.J. at 468); see also Shaw, 213 N.J. at 411, 421 (stating "[a] random stop based on nothing more than a non-particularized racial description of the person sought is especially subject to abuse").

We are convinced Officer Avent's investigatory detention was justified by reasonable articulable suspicion in light of the totality of the circumstances.  As confirmed by the BWC, the officers' testimony, and CAD report, Officer Avent, as she initiated the stop, observed defendant as one of the only two individuals in the immediate area of the convenience store within minutes of receiving notice from dispatch, the other of which he was walking beside and matched the 9-1-1 caller's description exactly, including wearing all black and a mask. Further, as the court notes, the initial investigatory stop by Officer Avent occurred within a two-block radius of the convenience store, and the individuals were walking away from the store, in the direction and manner consistent with the contemporaneous updates to dispatch provided by the 9-1-1 caller, who had followed the suspects.  We note the officers acted immediately upon the information provided by dispatch without delay, as the entire encounter took only three to five minutes.

A-1935-24

We reject defendant's argument that he was seized solely based on his race and gender, that 9-1-1 caller's description was generic and unreliable, and his reliance on Caldwell and Nyema to support his arguments. In Nyema, our Supreme Court concluded police dispatch alerting officers that the suspects of an alleged robbery were "two black males, one armed with a gun," was insufficient to support reasonable suspicion, despite the suspect's alleged "nervous behavior," which was "subject to many different interpretations." 249 N.J. at 515. In Caldwell, our Supreme Court held officers did not have reasonable suspicion when acting upon a tip from an informant concerning a description of a "black man standing in front of a building." 158 N.J. at 454-55.

Defendant himself acknowledges, and we agree, that the caller's description of the individuals included details beyond race and gender, including a description of the other individual and their contemporaneous location as they walked away from the convenience store. Indeed, the record reflects the dispatch, the officer's testimony, and the CAD report all described the caller as observing two black males, one of whom was dressed in all black and wearing a mask. Further, as correctly noted by the State, the tips in Caldwell and Nyema not only did not include any descriptions beyond the defendants' race or gender, but also either were not acted upon by police with such rapidity nor did not come

21

from a 9-1-1 call from a concerned citizen, who, in this case, followed defendant and provided additional updates to his location.

Finally, we also reject defendant's contention that Officer Avent did not have reasonable suspicion a crime had occurred in light of dispatch's description of the call. As testified by Officer Veloso, the responding officers, based on their experience, understood "flipping door handles" to indicate that the individuals were attempting to burglarize cars in the parking lot. We are convinced the dispatch adequately described potential criminal conduct such that Officer Avent had reasonable suspicion of a crime.

B.

Probable cause is a "a well-grounded suspicion that a crime has been or is being committed." State v. Pineiro, 181 N.J. 13, 21 (2004) (internal citations omitted). "It requires nothing more than 'a practical, common-sense decision whether, given all the circumstances . . . there is a fair probability' " that a crime has been committed. Dangerfield, 171 N.J. at 456 (internal citations omitted).

A totality of the circumstances standard applies to probable cause determinations because probable cause is a "fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Schneider v. Simonini, 163 N.J.

336, 361 (2000) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). The reasonableness of the arresting officers' actions must be considered from "the specific reasonable inferences which [they are] entitled to draw from the facts in light of [their] experience." Dangerfield, 171 N.J. at 456 (quoting Terry, 392 U.S. at 27). Probable cause, however "cannot be based upon a mere hunch." State v. Sansotta, 338 N.J. Super. 486, 491 (App. Div. 2001).

"[F]light alone does not create reasonable suspicion for a stop, let alone probable cause." Dangerfield, 171 N.J. at 457 (citing State v. Tucker, 136 N.J. 158, 169 (1994)). Indeed, our Supreme Court has noted certain individuals "may not feel entirely comfortable in the presence of some, if not all, police is regrettable, but true." Tucker, 136 N.J. at 169. The Tucker court also explained, however, "'reactions by individuals to a properly limited Terry encounter, . . . such as flight, may often provide the necessary information, in addition to that the officers already possess, to constitute probable cause.'" Id. at 168 (citation omitted); see also State v. Williams, 192 N.J. 1, 4 (2007); State v. Crawley, 187 N.J. 440, 460-61 (2006). Accordingly, a defendant's flight may "'reasonably justify an inference that [defendant's flight] was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt.'" Ibid. (citation omitted). In those circumstances, flight can "convert[] articulable

suspicion into probable cause" to justify an arrest. State v. Ramos, 282 N.J. Super. 19, 22 (App. Div. 1995).

We also note that when the police are involved in a collaborative investigation, the probable cause analysis is not limited to the knowledge possessed by the officer who effects the arrest. United States v. Belle, 593 F.2d 487, 497 n.15 (3d Cir. 1979) ("The collective knowledge of the investigating officers is measured in determining probable cause."); Wood v. Crouse, 436 F.2d 1077-78 (10th Cir. 1971) (same); see also United States v. Hensley, 469 U.S. 221, 229-33 (1985) (holding that officers who detain a suspect in reliance on a "wanted flyer" do not violate the Fourth Amendment if the flyer-issuing agency had reasonable, articulable suspicion "that the wanted person has committed an offense"); Crawley, 187 N.J. at 457-58 ("if the dispatcher in th[at] case had been provided adequate facts from a reliable informant to establish a reasonable suspicion that defendant was armed, common sense tells us that the dispatcher had the power to delegate the actual stop to officers in the field").

We are convinced Officer Dacruz's arrest, and later search incident to that arrest which produced defendant's handgun, was supported by probable cause. In light of our conclusion that the officers had reasonable suspicion to initiate the initial investigatory stop, we find defendant's flight converted reasonable

24

suspicion to probable cause because the arrest was also supported by all the noted factors supporting Officer Avent's reasonable suspicion. See Crawley, 187 N.J. at 457-58. In any event, we are satisfied his BWC footage and Officer Veloso's testimony confirm, at the time of the arrest, Officer Dacruz was also aware of the information provided by the 9-1-1 call and the temporal and geographical proximity to the alleged crime. We agree with defendant's argument that flight alone does not constitute probable cause under our precedent but find, unlike the arrest in Dangerfield where flight did not convert reasonable suspicion to probable cause, there are additional factors, of which Officer Dacruz was aware, to support the arrest.

To the extent defendant contends there was no probable cause because Officer Avent did not order defendant to stop, we reject it. As the State notes, this is a case where officers had reasonable suspicion before defendant's flight, and, further, as the court found, there is probable cause to support defendant's alleged obstruction but also his attempted burglary in light of the details described on the 9-1-1 call that two individuals were "flipping" vehicle door handles in the parking lot. In any event, Officer Dacruz's BWC footage also confirms defendant was, indeed, ordered to stop.

C.

Under N.J.S.A. 40A:14-118.3(a), "every uniformed State, county, and municipal patrol law enforcement officer shall wear a [BWC] that electronically records audio and video while acting in the performance of the officer's official duties, except" in certain limited circumstances.  When an officer fails to turn on their BWC, N.J.S.A. 40A:14-118.5(q)(2) provides, in relevant part:

> If a law enforcement officer, employee, or agent fails to adhere to the recording or retention requirements contained in this act, or intentionally interferes with a body worn camera's ability to accurately capture audio or video recordings:
>
> . . . .
>
> (2) there shall be a rebuttable presumption that exculpatory evidence was destroyed or not captured in favor of a criminal defendant who reasonably asserts that exculpatory evidence was destroyed or not captured.

In State v. Jones, we rejected the trial judge's determination that the rebuttable presumption set forth in N.J.S.A. 40A:14-118.5(q) is limited to trials and does not apply to suppression hearings.  475 N.J. Super. 520, 531-32 (App. Div. 2023).  Hence, the presumption applies here, although it is overcome.  In State v. Seligman, we noted, "nothing in the text of the statute, or in our interpretation of it in Jones, suggests that a violation the BWC Directive, now

26

incorporated by reference in N.J.S.A. 40A:14-118.5, warrants automatic suppression of evidence otherwise lawfully seized under our State and federal constitutions."  480 N.J. Super. 509, 524 (App. Div. 2025).  "[T]he Legislature clearly knows how to prescribe the suppression remedy for statutory violations, see, e.g., N.J.S.A. 2A:156A-21, but did not do so with respect to BWC violations."  Ibid.

We are convinced Officer Avent's failure to turn on her BWC and its triggering of the adverse inference under N.J.S.A. 40A:14-118.5(q)(2) does not require a remand for additional fact-finding and are satisfied there is ample evidence in the record to rebut it.  In particular, we find Officer Veloso's testimony, including his conversation confirming the substance of the 9-1-1 call from the caller himself, and Officer Rodriguez's testimony, including his perspective of what he observed of the individuals as he chased, corroborate her account and overcome any inference that exculpatory evidence was destroyed. If there was any doubt Officer Avent observed an individual wearing all black and a mask, her BWC and testimony support she described to the other responding officers that the other individual was dressed in all black and specifically wearing a mask.  Finally, we note the court found both officers, and Officer Avent's testimony, "extremely credible."

We further are satisfied the court, in both its oral and written description, expressly acknowledged Officer Avent's failure and discussed the statutory adverse inference. Accordingly, we reject defendant's argument that the court did not consider Officer Avent's failure to turn on her BWC and the adverse inference to which he was entitled.

To the extent we have not specifically addressed any of defendant's arguments in any of the subheadings, it is because we recommend that the panel conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division