SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Peter Nyema (A-39-20) (085146)**
**State v. Jamar J. Myers (A-40-20) (082858)**

**Argued October 25, 2021 -- Decided January 25, 2022**

**PIERRE-LOUIS, J., writing for a unanimous Court.**

In this case, the Court considers whether reasonable and articulable suspicion existed when a police officer conducted an investigatory stop of the vehicle in which defendants Peter Nyema and Jamar Myers were riding with co-defendant Tyrone Miller.

Around midnight on May 7, 2011, a 7-Eleven was robbed. At approximately 12:15 a.m., Sergeant Mark Horan of the Hamilton Township Police Department received a transmission about the armed robbery, which "had just occurred." Horan testified that the dispatch described the suspects "as two Black males, one with a handgun." Horan activated the lights and sirens on his marked patrol car and drove towards the 7-Eleven.

Approximately three-quarters of a mile from the 7-Eleven, Horan saw a car approaching in the oncoming traffic lane. Using the spotlight mounted to his police vehicle to illuminate the inside of the car, he observed that the occupants were a man and a woman and let them pass. Sergeant Horan testified that as he continued on, a second set of headlights approached. He illuminated the inside of the vehicle and observed three Black males; "[t]he description of the suspects was two Black males so at that point I decided to issue a motor vehicle stop on the second vehicle." Horan later explained that he was also struck by the lack of reaction to the spotlight by the occupants of the car, and that he "took into consideration the short distance from the scene, as well as the short amount of time from the call" as he made the stop.

Upon stopping the vehicle, Sergeant Horan radioed headquarters with the license plate number and a description of the car, and two more officers arrived. Before he approached the vehicle, Horan learned from one of the other officers that the robbery suspects had been wearing dark or black clothing or jackets. As he approached, Horan observed "some dark jackets" on the unoccupied rear passenger seat and on the floor of the vehicle. Horan spoke with the driver, who was later identified as Miller. Nyema was sitting in the passenger seat and Myers was in the rear passenger-side seat. The dispatcher advised Horan that the vehicle had been reported stolen. All three occupants were placed under arrest.

1

More officers arrived on the scene, and while several officers secured the arrestees, others assisted Horan in searching for a weapon. First, Horan retrieved the clothing he had observed from the backseat of the vehicle. Then, he and the other officers searched other parts of the vehicle, locating additional clothing in the trunk and a black semi-automatic handgun under the hood. Searches of the men themselves yielded just under $600 cash. Approximately $600 was reported stolen from the 7-Eleven. The vehicle was then impounded, and police transported the three men to the police station.

Miller pled guilty to two weapons offenses and agreed to testify against Nyema and Myers, who jointly moved to suppress the physical evidence seized from the stop. The trial court granted the motion in part as to the items seized from the trunk and the hood. But the court found that the initial stop was supported by reasonable and articulable suspicion, that the retrieval of clothing from the interior of the vehicle was permitted under the plain view exception to the warrant requirement, and that the money was lawfully seized incident to defendants' arrest. As to the robbery of the 7-11, both Myers and Nyema pled guilty to first-degree robbery.

Both defendants appealed from the partial denial of their motion to suppress. In Myers's case, the Appellate Division affirmed. In Nyema's case, the Appellate Division held that the stop was not based on reasonable and articulable suspicion. 465 N.J. Super. 181, 185 (App. Div. 2020). Accordingly, Nyema's conviction was reversed, his sentence vacated, and the matter remanded for further proceedings. Ibid.

The Court granted certification in Nyema. 245 N.J. 256 (2021). On reconsideration, it granted certification in Myers "limited to the issue of whether the police officer had reasonable articulable suspicion to stop the car." 245 N.J. 250, 251 (2021).

**HELD:** The only information the officer possessed at the time of the stop was the race and sex of the suspects, with no further descriptors. That information, which effectively placed every single Black male in the area under the veil of suspicion, was insufficient to justify the stop of the vehicle and therefore does not withstand constitutional scrutiny.

1. Searches and seizures conducted without warrants issued upon probable cause are presumptively unreasonable and are invalid unless they fall within one of the few well-delineated exceptions to the warrant requirement. The exception at issue in this case is an investigative stop, a procedure that involves a relatively brief detention by police during which a person's movement is restricted. An investigative stop or detention does not offend the Federal or State Constitution, and no warrant is needed, if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity. (pp. 21-22)

2. Although reasonable suspicion is a less demanding standard than probable cause, neither inarticulate hunches nor an arresting officer's subjective good faith suffices.

2

Determining whether reasonable and articulable suspicion exists for an investigatory stop is a highly fact-intensive inquiry that demands evaluation of the totality of circumstances surrounding the police-citizen encounter.  In many cases, the reasonable suspicion inquiry begins with the description police obtained regarding a person involved in criminal activity and whether that information was sufficient to initiate an investigatory detention.  In State v. Shaw, 213 N.J. 398 (2012), and State v. Caldwell, 158 N.J. 452 (1999), the Court determined that police lacked reasonable suspicion to conduct an evidentiary stop based on descriptions limited to the race and sex of the suspect.  The Court reviews those cases in detail and notes that even inquiries or investigative techniques that do not qualify as searches and seizures must still comport with the Equal Protection Clause.  And New Jersey jurisprudence is well-settled that seemingly furtive movements, without more, are insufficient to constitute reasonable and articulable suspicion.  The totality of the circumstances of the encounter must be considered in a fact-sensitive analysis to determine whether officers objectively possessed reasonable and articulable suspicion to conduct an investigatory stop.  (pp. 23-27)

3.  Applying those principles, the Court does not find that the information Sergeant Horan possessed at the time of the motor-vehicle stop constituted reasonable and articulable suspicion.  Certainly, race and sex -- when taken together with other, discrete factors -- can support reasonable and articulable suspicion.  But here, the initial description did not provide any additional physical descriptions that would differentiate the two Black male suspects from any other Black men in New Jersey.  And the radio dispatch indicated that the store was robbed by two Black men.  Sergeant Horan testified that upon seeing three Black males in the vehicle, he inferred that the third was the getaway driver.  While Sergeant Horan's inference was reasonable, the reality is that the ambiguous nature of the description could have resulted in Black men in any configuration and using any mode of transportation being stopped because the only descriptors of the suspects were race and sex.  Sergeant Horan saw the clothing and learned the car had been reported stolen after the stop, but information acquired after a stop cannot retroactively serve as the basis for the stop.  Defendants' non-reaction to the spotlight -- like nervous behavior that courts have reasonably found not to support reasonable suspicion -- did not justify the stop.  And even considering the closeness of Sergeant Horan's encounter with defendants in terms of spatial and temporal proximity to the robbery does not add significantly to the analysis of whether the stop was lawful because the 7-Eleven was located on a roadway close to a major interstate highway and the record is unclear as to when the robbery actually occurred.  The non-specific and non-individualized factors asserted here do not add up to a totality of circumstances analysis upon which reasonable suspicion can be found. Zero plus zero will always equal zero.  (pp. 28-33)

**AFFIRMED in <u>Nyema</u>; REVERSED and REMANDED in <u>Myers</u>.**

**CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion.**

3

SUPREME COURT OF NEW JERSEY
A-39 September Term 2020
A-40 September Term 2020
085146 and 082858

State of New Jersey,

Plaintiff-Appellant,

v.

Peter Nyema, a/k/a
Pete Dinah, Kareem T. Jeffries,
Hne Nyema, and Pete Nyme,

Defendant-Respondent.

State of New Jersey,

Plaintiff-Respondent,

v.

Jamar J. Myers,

Defendant-Appellant.

State v. Peter Nyema (A-39-20):
On certification to the Superior Court,
Appellate Division, whose opinion is reported at
465 N.J. Super. 181 (App. Div. 2020).

State v. Jamar J. Myers (A-40-20):
On certification to the Superior Court,
Appellate Division.

1

Michael D. Grillo, Assistant Prosecutor, argued the cause for appellant in State v. Nyema (A-39-20) and respondent in State v. Myers (A-40-20) (Angelo J. Onofri, Mercer County Prosecutor, attorney; Randolph E. Mershon, III, Assistant Prosecutor, of counsel and on the briefs, and Laura Sunyak, Assistant Prosecutor, on the briefs).

Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for respondent in State v. Nyema (A-39-20) (Joseph E. Krakora, Public Defender, attorney; Alyssa Aiello, of counsel and on the briefs).

Tamar Y. Lerer, Assistant Deputy Public Defender, argued the cause for appellant in State v. Myers (A-40-20) (Joseph E. Krakora, Public Defender, attorney; Tamar Y. Lerer, of counsel and on the briefs).

Steven A. Yomtov, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey in State v. Nyema (A-39-20) and in State v. Myers (A-40-20) (Andrew J. Bruck, Acting Attorney General, attorney; Carol M. Henderson, Assistant Attorney General, of counsel, and Steven A. Yomtov, of counsel and on the briefs).

Alexander Shalom argued the case for amicus curiae 66 Black ministers and other clergy members in State v. Nyema (A-39-20) and in State v. Myers (A-40-20) (American Civil Liberties Union of New Jersey Foundation, attorneys; Alexander Shalom, Jeanne LoCicero, and Karen Thompson, on the briefs).

Raymond Brown argued the cause for amici curiae Latino Leadership Alliance of New Jersey and National Coalition of Latino Officers in State v. Nyema (A-39-20) and State v. Myers (A-40-20) (Pashman Stein Walder

Hayden, attorneys; CJ Griffin and Darcy Baboulis-Gyscek, on the briefs).

Robert J. DeGroot argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey in State v. Nyema (A-39-20) and State v. Myers (A-40-20) (Oleg Nekritin, on the briefs).

Joseph M. Mazraani submitted a brief on behalf of amicus curiae Kristin Henning of the Georgetown Law Juvenile Justice Clinic & Initiative in State v. Nyema (A-39-20) and State v. Myers (A-40-20) (Mazraani & Liguori, and Georgetown Juvenile Justice Clinic & Initiative, attorneys; Joseph M. Mazraani, and Kristin Henning, of the District of Columbia bar, admitted pro hac vice, on the briefs).

Jonathan Romberg submitted a brief on behalf of amicus curiae Seton Hall University School of Law Center for Social Justice in State v. Myers (A-40-20) (Seton Hall University Scott of Law Center for Social Justice, attorneys; Jonathan Romberg, of counsel and on the brief).

JUSTICE PIERRE-LOUIS delivered the opinion of the Court.

In this case, we must determine whether reasonable and articulable suspicion existed when a police officer conducted an investigatory stop of the vehicle in which defendants were riding. After the robbery of a 7-Eleven store in Hamilton, police dispatch alerted officers that the suspects were two Black males, one armed with a gun. Sergeant Mark Horan heard the radio transmission and made his way to the scene. While en route, Sergeant Horan

3

used the mounted spotlight on his marked police car to illuminate the interior of passing vehicles in order to search for the robbery suspects. In the first vehicle Horan encountered, a man and a woman reacted with annoyance and alarm when Horan shone the spotlight into their car. When Horan came across a second vehicle, approximately three-quarters of a mile from the store, he illuminated the interior of the car with the spotlight and saw three Black males inside. According to Horan, the men did not react to the spotlight at all. Horan viewed that non-reaction as "odd" considering the reaction of the passengers in the first car. At that point, the only information Horan had about the robbery was that the suspects were two Black males, one with a gun, who fled the robbery on foot. Dispatch had not provided any additional identifiers.

Based on the race and sex of the occupants and their non-reaction to the spotlight, Sergeant Horan executed a motor vehicle stop of the car. After stopping the car, Horan learned that the vehicle had been reported stolen so defendants were placed under arrest. A search of the car revealed dark clothing -- clothes matching what the suspects were wearing during the robbery -- and a handgun hidden under the hood of the car.

Defendants Peter Nyema, Jamar Myers, and a third co-defendant were charged with a host of offenses related to the 7-Eleven robbery. Nyema and Myers jointly moved to suppress the items seized during the search of the

4

vehicle, arguing that the stop was unlawful because it was not based on reasonable suspicion. The trial court denied the motion to suppress and both Myers and Nyema eventually pled guilty to first-degree robbery.

In separate appeals, both men challenged the denial of the motion to suppress, resulting in opposite Appellate Division outcomes. In Myers's appeal, an Appellate Division panel affirmed the trial court's denial of the motion to suppress, ruling that the stop was supported by reasonable suspicion. In Nyema's appeal, a different Appellate Division panel reversed the trial court and vacated Nyema's conviction and sentence, finding that Sergeant Horan did not have reasonable suspicion to conduct the stop of the car.

We granted both defendants' petitions for certification on the question of whether reasonable and articulable suspicion existed to stop the car. We now reverse the <u>Myers</u> decision and affirm in <u>Nyema</u>. The only information the officer possessed at the time of the stop was the race and sex of the suspects, with no further descriptors. That information, which effectively placed every single Black male in the area under the veil of suspicion, was insufficient to justify the stop of the vehicle and therefore does not withstand constitutional scrutiny.

We rely on the testimony developed at the evidentiary hearing on defendants' motion to suppress for the following summary.

Around midnight on May 7, 2011, a 7-Eleven in Hamilton, New Jersey was robbed. At approximately 12:15 a.m., Sergeant Mark Horan of the Hamilton Township Police Department received a transmission about the armed robbery, which "had just occurred." Horan testified that the dispatch described the suspects "as two Black males, one with a handgun."

Horan activated the lights and sirens on his marked patrol car and drove towards the 7-Eleven at a "relatively high speed" for one to two minutes, shutting off the lights and sirens as he drew closer. According to Sergeant Horan, traffic was light because it was late at night. Approximately three-quarters of a mile from the 7-Eleven, Horan saw a car approaching in the oncoming traffic lane. Using the spotlight mounted to his police vehicle to illuminate the inside of the car,[1] he observed that the occupants were a man and a woman and let them pass. Sergeant Horan testified as follows:

> I continued on. The second set of headlights approached me, I illuminated the inside of that vehicle and I observed three Black males, you know, that went past me.

---

[1] This was not a standard procedure sanctioned by the Hamilton Police Department, but a technique that Horan employed while searching for suspects at night.

> The description of the suspects was two Black males so at that point I decided to issue a motor vehicle stop on the second vehicle.

He would later explain that the man and the woman in the first vehicle reacted to the spotlight with "alarm or annoyance," and that the "driver shielded his eyes a little bit." In contrast, the occupants of the second vehicle, including defendants, showed no reaction and kept looking straight ahead. Horan testified that the occupants of the second vehicle "were all males, Black males. And I received no response from any of them that I could observe, no one looked at me, no one turned towards the car. It was as if I wasn't there." He explained that this non-reaction "struck [him] as odd." He further testified that it was his "experience that sometimes people who prefer not to be noticed tend to ignore the spotlight."

Upon witnessing the non-reaction of the vehicle's occupants, Horan activated his lights and executed a stop of the second vehicle. Horan testified that at the time of the stop,

> [t]he sex and race were consistent with that of the description. I had three occupants in the vehicle. The suspects were described at the time of the call as two. So I had, at least, that. I took into consideration the short distance from the scene, as well as the short amount of time from the call and all those things considered is what I took into consideration to effect the stop.

7

Upon stopping the vehicle, Sergeant Horan radioed headquarters with the license plate number and a description of the car -- a 2000 silver Toyota Corolla with Pennsylvania license plates.

Two more officers arrived just as Horan was exiting his patrol car. All three approached the vehicle with their weapons drawn. Horan ordered the driver to turn off the engine and told all occupants to place their hands on the roof. Before he approached the vehicle, Horan learned from one of the other officers that the robbery suspects had been wearing dark or black clothing or jackets. As he approached, Horan observed "some dark jackets" on the unoccupied rear passenger seat and on the floor of the vehicle.

Horan spoke with the driver, who was later identified as co-defendant Tyrone Miller, a/k/a Ajene Drew. Nyema was sitting in the passenger seat and Myers was in the rear passenger-side seat. The dispatcher asked Horan to confirm the license plate number and when he did, the dispatcher advised Horan that the vehicle had been reported stolen. All three occupants were then removed from the vehicle and placed under arrest.

More officers arrived on the scene, and while several officers secured the arrestees, others assisted Horan in searching for a weapon. First, Horan retrieved the clothing he had observed from the backseat of the vehicle. Then, he and the other officers searched other parts of the vehicle, locating additional

clothing in the trunk and a black semi-automatic handgun wrapped in a red bandana under the hood.  Searches of the men themselves yielded just under $600 cash.  Approximately $600 was reported stolen from the 7-Eleven robbery.  The vehicle was then impounded, and police transported the three men to the police station.

## II.

On August 23, 2011, a Mercer County grand jury charged Nyema, Myers, and Miller in a multiple count indictment.

All three men were charged with first-degree robbery, as well as theft, aggravated assault, terroristic threats, several weapons offenses, and theft by receiving stolen property.  They were each also charged with conduct-specific counts related to the theft of the car or the arrest, and Miller was charged with possession of a firearm as a felon.

Miller pled guilty to two second-degree weapons offenses and agreed to testify against Nyema and Myers.

## A.

Nyema and Myers jointly moved to suppress the physical evidence seized from the stop.  During a three-day evidentiary hearing, the trial court heard testimony from Sergeant Horan; Nyema's father, who owned the vehicle and who testified that it had not been reported stolen; and Detective William

9

Mulryne, who testified that he had personally taken the stolen vehicle report from Nyema's father several days before the car stop.

The trial court granted the motion in part and denied it in part, suppressing the handgun found under the hood of the car but ruling that the clothing and money had been lawfully seized. The court reasoned that because the initial stop was supported by reasonable and articulable suspicion, the retrieval of the clothing from the interior of the vehicle was permitted under the plain view exception to the warrant requirement and the money was lawfully seized incident to defendants' arrest. However, the trial court found that the full warrantless search of the vehicle, including the trunk and hood, which yielded the handgun, could not be justified by exigent circumstances because the vehicle's occupants were already securely in custody and the vehicle was located in a residential neighborhood shortly after midnight.

Although the court found that defendants did not have a reasonable expectation of privacy in the vehicle because it had been reported stolen, the court explained that a lack of privacy interest was not a valid substitute for probable cause; rather, it was only one factor in determining whether exigent circumstances justified a warrantless search. The court concluded that the officers could have simply impounded the vehicle and searched it back at the police precinct or applied for a warrant while at the scene.

In upholding Horan's reasonable suspicion for the initial car stop, the court noted that the stop occurred close to the robbery in terms of both time and space; that Horan observed the vehicle approaching from the direction of the crime scene; that the vehicle's occupants "gave no response whatsoever to the lights shone on them, made no eye contact whatsoever"; and "[a]lso, to be quite honest, the racial makeup of the occupants of the vehicle, three Black males traveling away from the scene."

## B.

### Myers -- Guilty Plea and Sentencing

On November 29, 2016, Myers pled guilty to first-degree robbery of the 7-Eleven, reserving his right to appeal several evidentiary rulings, including the denial of his motion to suppress based on the stop. Myers also pled guilty to first-degree felony murder on an unrelated indictment[2] and entered guilty pleas to three violations of probation.

On July 7, 2017, Myers was sentenced to a term of thirty years for the unrelated felony murder, with no possibility of parole, and a concurrent term of twelve years, subject to the No Early Release Act (NERA), for the armed

---

[2] In February 2014, Myers was charged in a second indictment related to two offenses that occurred in Trenton on April 29, 2011 -- an attempted robbery of one pharmacy and the completed robbery of another pharmacy, during which the pharmacist was shot and killed.

11

robbery of the 7-Eleven. For the probation violations, Myers was sentenced to five years.

Myers appealed, arguing, among other things, that the joint motion to suppress should have been granted in its entirety because the initial stop was not based on reasonable suspicion and, furthermore, that the plain view exception to the warrant requirement did not justify the officers' entry into the vehicle.

The Appellate Division affirmed the trial court's rulings and Myers's conviction. Regarding the motion to suppress, the court noted that the trial court had specifically rejected Myers's argument that the stop was based solely on defendants' race and sex. Rather, the Appellate Division found that

> the trial court pointed out that the suspects were reported to be African-American and, therefore, there was a reasonable and particularized suspicion to conduct an investigatory stop of a vehicle with African-American men inside when that vehicle was seen a short distance from the 7-Eleven in the early morning when there were few other cars on the road.

The Appellate Division concluded that "those factual findings are supported by the evidence in the record" and that there was therefore no basis for reversal. The court also affirmed the trial court's ruling that seizure of the clothing from the backseat of the vehicle was justified by the plain view exception to the warrant requirement. This Court denied Myers's petition for

12

certification seeking review of the denial of his motion to suppress. 240 N.J. 22 (2019).

C.

Nyema -- Trial, Guilty Plea and Sentencing

On September 20, 2017, a jury trial proceeded in Nyema's case. After the State rested, Nyema entered an open guilty plea to first-degree robbery. Nyema's sentencing took place almost a year later on September 6, 2018, immediately after an unsuccessful motion to withdraw his guilty plea. The court sentenced Nyema to a custodial term of fifteen years, subject to NERA.

Like Myers, Nyema appealed the partial denial of the joint motion to suppress, arguing that police lacked reasonable suspicion to conduct the initial stop and that, even if the stop had been lawful, the officers' warrantless entry into the vehicle to seize clothing from the backseat was not justified by the plain view exception.

The Appellate Division held that the stop was not based on reasonable and articulable suspicion. State v. Nyema, 465 N.J. Super. 181, 185 (App. Div. 2020). Accordingly, Nyema's conviction was reversed, his sentence vacated, and the matter remanded for further proceedings. Ibid.

The Appellate Division rejected the trial court's conclusion that Nyema lacked a reasonable expectation of privacy in the vehicle because it had been

13

reported stolen. Id. at 189. In the court's view, although evidence had been presented to indicate that the vehicle had been reported stolen, no testimony indicated that the vehicle actually was stolen and, therefore, Nyema retained a reasonable expectation of privacy in his father's car. Id. at 189-90. The court then considered whether the stop was based on a reasonable and articulable suspicion. Id. at 190. The court summarized Sergeant Horan's testimony on why he stopped the vehicle as: "(1) a store had been robbed by two Black men; (2) the car was within three quarters of a mile from the store, traveling away from it; and (3) the three Black men in the car did not react to the spotlight he pointed into their vehicle." Id. at 191.

The court explained that "[t]he men's non-reaction to the light does not add much to a reasonable articulable suspicion" because Horan only observed them for a second or two as they drove by. Ibid. Furthermore, the court noted that the record "does not establish how much time passed between when the robbery occurred and the car was stopped"; therefore, it was unclear "whether Horan had a reasonable basis to assume the perpetrators were still in the area." Id. at 192.

The court found that "[k]nowledge of the race and gender of criminal suspects, without more, is insufficient suspicion to effectuate a seizure." Ibid. Because Horan's information amounted to little more than the race and sex of

14

the criminal suspects, it amounted only to a hunch, not to reasonable suspicion. Ibid. To hold otherwise "would mean that the police could have stopped all cars with two or more Black men within a three-quarters-of-a-mile radius of the 7-Eleven store." Ibid.

The State petitioned this Court for certification, arguing that the Nyema decision directly conflicted with Myers and improperly focused "solely upon the suspect's description."

This Court granted the State's petition for certification. 245 N.J. 256 (2021). Because the Appellate Division's published opinion in Nyema's case held that Horan did not have reasonable suspicion to stop the car based on the same exact set of facts in Myers's case, Myers filed a motion for reconsideration of his petition for certification. This Court granted Myers's motion for reconsideration, "limited to the issue of whether the police officer had reasonable articulable suspicion to stop the car." 245 N.J. 250, 251 (2021).

### III.

### A.

With regard to Myers, the State contends that the Appellate Division correctly upheld the trial court's finding that there was reasonable and

articulable suspicion to stop the vehicle based on the evidence in the record. The State urges this Court to affirm that holding.

Regarding Nyema, the State argues that the Appellate Division decision should be reversed and Nyema's conviction reinstated. The State contends that, in addition to the defendants' race and sex, the motion court found reasonable suspicion based on (1) the short duration between the initial robbery report and the stop; (2) the location and direction of the vehicle in relation to the 7-Eleven; (3) the presence of three individuals in the car, giving rise to the inference that the two robbers had been joined by a getaway driver; and (4) the occupants' non-reaction to the spotlight.

As for the time, the State argues that the Nyema decision was incorrect in finding that the State failed to present evidence establishing how much time elapsed between the robbery and the stop. To the contrary, the State notes that Sergeant Horan testified that he saw the defendants' vehicle about two or three minutes after receiving the report that a robbery had "just occurred." Regarding defendants' behavior when Sergeant Horan used the spotlight on the second vehicle, the State argues that Nyema erred by discounting the defendants' non-reaction to the spotlight, particularly because that response contrasted so starkly with the reaction of the occupants of the previous vehicle.

16

According to the State, "[t]he defendants' abnormal non-reaction suggested a calculated effort on the part of all three defendants to avoid detection."

B.

The Attorney General, appearing as amicus curiae, takes no position regarding whether the investigatory stop in this case should be upheld. The Attorney General appears for the limited purpose of reiterating that racial profiling, in all its forms, must be eliminated from policing decisions. The Attorney General asserts that consideration of a person's race or ethnicity -- in drawing an inference that an individual may be involved in criminal activity or in exercising police discretion with respect to how the officer will deal with that person -- will not be tolerated and is prohibited by Attorney General Law Enforcement Directive No. 2005-1, which established a statewide policy prohibiting the practice of "Racially-Influenced Policing." The Attorney General notes, however, that under Directive No. 2005-1, when race is a descriptive factor in connection with a "Be-On-The-Lookout" announcement, or a pre-existing investigation into a specific criminal activity, it may be deemed an objective identifier. The Attorney General emphasizes that the correct legal standard for adjudicating whether reasonable suspicion exists is the totality-of-the-circumstances test.

Because defendants' arguments are substantially similar, we consider them together.

Myers argues that the stop was not supported by reasonable suspicion because "[t]he only similarities between the description of the suspects and the men are their race and gender." He emphasizes that the officer stopped a car occupied by three Black men based only on a report that two Black men had fled on foot after a nearby robbery. Myers argues that "there was no description of the suspects other than their race," and that "accept[ing] this meager description as constituting reasonable suspicion" would allow police to have stopped any number of Black men, whether in a car or on foot, within a three-quarter-mile radius of the crime scene.

Nyema takes the same position as Myers. Nyema argues that the Appellate Division decision in his case correctly concluded that reasonable suspicion did not exist. Analyzing the stop based on the totality of the circumstances, Nyema contends that both the proximity to the 7-Eleven and the defendants' non-reaction to the spotlight "provided zero basis for reasonable suspicion," leaving only a description of the two Black men fleeing on foot to establish reasonable suspicion for the stop.

D.

Several amici support defendants' positions.

Black Ministers and Other Clergy Members (collectively, Clergy members) argue that the other factors in this case -- proximity to the crime scene and the non-reaction to the spotlight -- fail to create reasonable and articulable suspicion. The Clergy members also contend that race-based stops cause tremendous harm and are unreasonable because they fail to meaningfully limit the number of people subjected to them. Furthermore, such stops involve an aggravated or uncomfortable response from Black motorists, which may result from a legitimate fear of potential violence from law enforcement. The Clergy members recommend that this Court create a prophylactic rule preventing police officers from effectuating stops where the only or predominant basis for the stop is that the stopped individuals match the race and gender of the suspects.

The Association of Criminal Defense Lawyers of New Jersey (ACDL) argues that this Court must affirm in Nyema and reverse in Myers because law enforcement impermissibly stopped the defendants on the basis of race. The ACDL reasons that racial profiling has been a historically pervasive problem and that investigative stops based on race are unconstitutional.

19

Amicus the Seton Hall University School of Law Center for Social Justice (the Center) argues that the suspects' non-reaction, location, and description provided no individualized basis for reasonable suspicion. Regarding location, the Center reasons that defendants' location provided no basis for individualized suspicion because the suspects could have driven in any direction away from the 7-Eleven and been anywhere within a fifty-mile radius of the store. The Center argues that the suspects' description provided no basis for reasonable suspicion other than identifying Black males, which was an impermissible basis for an investigatory stop.

In their joint amicus brief, the Latino Leadership Alliance of New Jersey (LLANJ) and the National Coalition of Latino Officers (NCLO) argue that the State failed to prove that police had reasonable suspicion to conduct an investigatory stop of the vehicle based on specific and articulable facts. Further, the LLANJ and NCLO contend that racial profiling significantly undermines trust in the criminal justice system and makes the state less safe for everyone.

Amicus Kristin Henning, Director of the Georgetown Law Juvenile Justice Clinic & Initiative, argues that there was no rational basis to believe that the men's non-reaction to the officer shining the light into the car had any bearing on suspicion. Furthermore, Henning contends that implicit racial bias

20

thrives when officers rely on vague, race-based descriptions. In this case, the description relied solely on race and sex, which is insufficient to constitute reasonable and articulable suspicion. Henning argues that race-based over-policing weakens constitutional protections and harms individuals, communities, and public safety.

IV.

A.

Our standard of review on a motion to suppress is deferential -- we must "uphold the factual findings underlying the trial court's decision so long as those findings are 'supported by sufficient credible evidence in the record.'" State v. Ahmad, 246 N.J. 592, 609 (2021) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). This Court defers to those findings in recognition of the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Elders, 192 N.J. at 244 (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). A trial court's legal conclusions, however, and its view of "the consequences that flow from established facts," are reviewed de novo. State v. Hubbard, 222 N.J. 249, 263 (2015).

B.

The Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, in almost identical language,

21

protect against unreasonable searches and seizures.  Under both Constitutions, "searches and seizures conducted without warrants issued upon probable cause are presumptively unreasonable and therefore invalid."  Elders, 192 N.J. at 246 (citations omitted).  Consequently, "the State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure 'fell within one of the few well-delineated exceptions to the warrant requirement.'"  Ibid. (quoting State v. Pineiro, 181 N.J. 13, 19-20 (2004)).

The exception at issue in this case is an investigative stop, a procedure that involves a relatively brief detention by police during which a person's movement is restricted.  See State v. Rosario, 229 N.J. 263, 272 (2017) (describing an investigative stop as a police encounter during which an objectively reasonable person would not feel free to leave).  When police stop a motor vehicle, the stop constitutes a seizure of persons, no matter how brief or limited.  State v. Scriven, 226 N.J. 20, 33 (2016).  An investigative stop or detention, however, does not offend the Federal or State Constitution, and no warrant is needed, "if it is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity."  State v. Rodriguez, 172 N.J. 117, 126 (2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)).

22

Although reasonable suspicion is a less demanding standard than probable cause, "[n]either 'inarticulate hunches' nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights." State v. Stovall, 170 N.J. 346, 372 (2002) (Coleman, J., concurring in part and dissenting in part) (quoting State v. Arthur, 149 N.J. 1, 7-8 (1997)); accord State v. Alessi, 240 N.J. 501, 518 (2020). Determining whether reasonable and articulable suspicion exists for an investigatory stop is a highly fact-intensive inquiry that demands evaluation of "the totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions." State v. Privott, 203 N.J. 16, 25-26 (2010) (quoting State v. Davis, 104 N.J. 490, 504 (1986)).

In many cases, the reasonable suspicion inquiry begins with the description police obtained regarding a person involved in criminal activity and whether that information was sufficient to initiate an investigatory detention. In State v. Shaw, this Court determined that the police lacked reasonable suspicion to conduct an investigatory stop when law enforcement arrived at a multi-unit apartment building to execute an arrest warrant for a Black, male fugitive. 213 N.J. 398, 401, 403 (2012). There, the police saw the

defendant, also a Black male, exit the building with a friend and immediately separate, seemingly because he saw the officers. Id. at 403. "[T]he only features that [the testifying officer] could say that [the defendant] shared in common with the targeted fugitive were that both were Black and both were men." Ibid. That commonality was insufficient to justify the stop, even in conjunction with the officer's belief that the two men split up to avoid police attention. See id. at 411-12.

In State v. Caldwell, police acting on a tip from an informant conducted an investigatory stop of the defendant based on a description that the individual sought was a Black man standing in front of a building. 158 N.J. 452, 454-55 (1999). In invalidating the stop, this Court found that the "description of the suspect . . . was clearly inadequate" and explained that "police must have a sufficiently detailed description of the person to be able to identify that person as the suspect named by the informant." Id. at 460. The Court concluded that "[w]ithout such a requirement, police could theoretically conduct wide-ranging seizures on the basis of vague general descriptions." Ibid. The Court further noted that the tip lacked physical descriptors such as "the individual's height, weight, or the clothing he was wearing," and it included "no distinguishing characteristics that would have assisted [the officer] in making a positive identification of the suspect." Ibid.

24

In his concurring opinion, Justice Handler pointed out that "[r]ace alone is not a specific and articulable fact sufficient to establish the reasonable, particularized suspicion needed for an investigatory stop of a defendant. Adding gender to race does not augment the description of the suspect so that he could fairly be picked out by officers intending to investigate." Id. at 468 (Handler, J., concurring). In Justice Handler's view, the minimal description that consisted simply of the race and sex of the individual was "descriptive of nothing" in the constitutional context. Ibid.

New Jersey courts, moreover, have noted that even inquiries or investigative techniques that do not qualify as searches and seizures and therefore do not require reasonable and articulable suspicion must still comport with the Equal Protection Clause. See, e.g., State v. Maryland, 167 N.J. 471, 484 (2001) ("[T]he questioning of [a] defendant as part of a field inquiry is not sustainable if the officers approached him and his companions solely because of their race and age."); State v. Segars, 172 N.J. 481, 493 (2002) ("[I]f race is the sole motivation underlying the use of a M[obile] D[ata] T[erminal] [in checking the status of a driver's license], it is illegal . . . .").

Indeed, in 2005, the Attorney General issued Law Enforcement Directive 2005-1, which established a statewide policy prohibiting the practice of racially influenced policing. See Attorney General, Directive Establishing an

25

Official Statewide Policy Defining and Prohibiting the Practice of "Racially-Influenced Policing" (June 28, 2005) (Directive 2005-1). The Directive dictates that law enforcement officers are not to

> consider a person's race or ethnicity as a factor in drawing an inference or conclusion that the person may be involved in criminal activity, or as a factor in exercising police discretion as to how to stop or otherwise treat the person, except when responding to a suspect-specific or investigation-specific "Be on the lookout" (B.O.LO.) situation . . . .

The Directive further emphasizes that it does not prohibit officers "from taking into account a person's race or ethnicity when race or ethnicity is used to describe physical characteristics that identify a particular individual . . . being sought by a law enforcement agency in furtherance of a specific investigation or prosecution." Ibid.

In addition to the race and sex of the suspect, our courts have considered whether other factors such as nervous behavior, furtive movements, or other actions form the basis for reasonable and articulable suspicion. Our jurisprudence is well-settled that seemingly furtive movements, without more, are insufficient to constitute reasonable and articulable suspicion. See Rosario, 229 N.J. at 277 ("Nervousness and excited movements are common responses to unanticipated encounters with police officers on the road . . . ."); State v. Lund, 119 N.J. 35, 47 (1990) ("[M]ere furtive gestures of an occupant

26

of an automobile do not give rise to an articulable suspicion suggesting criminal activity." (quoting State v. Schlosser, 774 P.2d 1132, 1137 (Utah 1989))).

Similarly, when circumstances are not otherwise suspicious, "[a] person's failure to make eye contact with the police does not change that." State v. Stampone, 341 N.J. Super. 247, 252 (App. Div. 2001); see also United States v. Foster, 824 F.3d 84, 93 (4th Cir. 2016) (noting that lack of eye contact is an "ambiguous indicator" that "may still contribute to a finding of reasonable suspicion" but that courts are "hesitant" to weigh heavily "because it is no more likely to be an indicator of suspiciousness than a show of respect and an attempt to avoid confrontation." (quotation omitted)); United States v. Hernandez-Alvarado, 891 F.2d 1414, 1419 n.6 (9th Cir. 1989) ("[A]voidance of eye contact has been deemed an inappropriate factor to consider unless special circumstances make innocent avoidance of eye contact improbable.") (alteration and quotation omitted); United States v. Smith, 799 F.2d 704, 707 (11th Cir. 1986) (finding the defendant-driver's failure to look at a patrol car to be "fully consistent with cautious driving" that "in no way gives rise to a reasonable suspicion of illegal activity either alone or in combination with the other circumstances surrounding the stop").

27

In sum, the totality of the circumstances of the encounter must be considered in a very fact-sensitive analysis to determine whether officers objectively possessed reasonable and articulable suspicion to conduct an investigatory stop. State v. Gamble, 218 N.J. 412, 431 (2014); Pineiro, 181 N.J. at 22.

V.

Applying those principles to the present case and taking into account the totality of the circumstances, we do not find that the information Sergeant Horan possessed at the time of the motor-vehicle stop constituted reasonable and articulable suspicion.

Sergeant Horan testified that he "believe[d] that the entirety of the initial dispatch" stated that there were "two suspects described as Black males, one with a handgun." Certainly, race and sex -- when taken together with other, discrete factors -- can support reasonable and articulable suspicion. But here, the initial description did not provide any additional physical descriptions such as the suspects' approximate heights, weights, ages, clothing worn, mode of transportation, or any other identifying feature that would differentiate the two Black male suspects from any other Black men in New Jersey. That vague description, quite frankly, was "descriptive of nothing." See Caldwell, 158 N.J. at 468 (Handler, J., concurring). If that description alone were sufficient

28

to allow police to conduct an investigatory stop of defendants' vehicle, then law enforcement officers would have been permitted to stop every Black man within a reasonable radius of the robbery. Such a generic description that encompasses each and every man belonging to a particular race cannot, without more, meet the constitutional threshold of individualized reasonable suspicion.

And the radio dispatch indicated that the store was robbed by <u>two</u> Black men. Sergeant Horan testified that upon seeing <u>three</u> Black males in the vehicle, he inferred that the third was the getaway driver. While Sergeant Horan's inference was reasonable, with the dearth of information available at the time regarding the suspects, it could easily be argued that police would have also been able to stop a single Black man in a car, or on foot, based on the assumption that the robbery suspects split up after the crime. The reality is that the ambiguous nature of the description could have resulted in Black men in any configuration and using any mode of transportation being stopped because the only descriptors of the suspects were race and sex.

Even Sergeant Horan testified that the only information he could confirm based on the initial report was the race and sex of the vehicle's occupants during the following exchange with the prosecutor:

PROSECUTOR: And when you walked up, were you able to confirm any other part of the description in regard to the transmissions that you received from dispatch?

SERGEANT HORAN: Other than all three occupants being male, Black and the clothing, there was nothing else to confirm.

Although Sergeant Horan mentioned the clothing, he testified that as he approached the vehicle after executing the stop, "[a]n officer at the scene relayed information that the suspects were wearing dark or black clothing or jackets." Information acquired after a stop cannot retroactively serve as the basis for the stop. For constitutional purposes, what matters is the information Horan possessed when he activated his overhead lights and pulled the car over. At that point, as discussed, he did not have a description of the clothing worn by the robbery suspects. He also did not know that the car had been reported stolen. All he knew was that the suspects were Black men.

That brings us to the other factors that the State argues contribute to a finding of reasonable suspicion based on the totality of the circumstances. Sergeant Horan testified that when he shined the spotlight on defendants' car and illuminated the interior, the three men did not react at all. He recalled that, as he observed defendants for a second or two, "[a]ll three heads remained straight ahead, focused on their path. No squinting, ducking,

30

shielding their eyes, which is, in my experience, uncommon." The State argued that Sergeant Horan's use of his patrol car's spotlight and defendants' behavior in response is critical to our analysis. The State even conceded at oral argument that without defendants' non-reaction to the spotlight, it would be very difficult to argue that reasonable suspicion existed prior to the stop.

As this Court and many other courts have recognized, nervous behavior or lack of eye contact with police cannot drive the reasonable suspicion analysis given the wide range of behavior exhibited by many different people for varying reasons while in the presence of police. See Rosario, 229 N.J. at 277. In some cases, a defendant's alarmed reaction is asserted as justification for a stop, but in other cases, a defendant's non-reaction is argued to form the basis for reasonable suspicion. See, e.g., United States v. Escamilla, 560 F.2d 1229, 1233 (5th Cir. 1977) (explaining that the defendants' decision not to "acknowledge the officers' presence" cannot play any role in reasonable suspicion, in part because it would conflict with the court's previous holding that repeated glances at officers were suspicious and "would put the officers in a classic 'heads I win, tails you lose' position"); cf. United States v. Sokolow, 490 U.S. 1, 13 (1989) (Marshall, J., dissenting) (noting that law enforcement profiles of drug couriers have a "chameleon-like way of adapting to any particular set of observations" (quotation omitted)). In short, whatever

31

individuals may do -- whether they do nothing, something, or anything in between -- the behavior can be argued to be suspicious.

Thus, as with race and sex, a suspect's conduct can be a factor, but when the conduct in question is an ambiguous indicator of involvement in criminal activity and subject to many different interpretations, that conduct cannot alone form the basis for reasonable suspicion.

Even considering the closeness of Sergeant Horan's encounter with defendants in terms of spatial and temporal proximity to the robbery does not add significantly to the analysis of whether the stop was lawful. Horan was approximately three-quarters of a mile from the 7-Eleven when he spotted defendants' vehicle traveling away from the store and executed the stop. The record is unclear as to precisely when the robbery occurred. Sergeant Horan testified that he heard the radio dispatch regarding the robbery "just around midnight" or "a quarter after midnight" when dispatch indicated that the robbery "just happened." Horan then testified that he encountered defendants' vehicle approximately three minutes after receiving the dispatch.

The State argues that the timing of the robbery is clear because dispatch used the term "just" in describing when the robbery occurred. Certainly, at some point after the robbery someone in the 7-Eleven called 9-1-1, but we do not know when that was in relation to when the robbery occurred and when

32

dispatch alerted police. In this case, a matter of minutes makes a difference given the area in which the suspects could reasonably be expected to be after the commission of the robbery. Again, proximity in terms of time and place can certainly be factors in determining whether reasonable suspicion existed. On this record, however, where the 7-Eleven was located on a roadway close to a major interstate highway and the record is unclear as to when the robbery actually occurred, the asserted proximity in time and place is not sufficient to support the finding of reasonable suspicion.

Finally, we note that the non-specific and non-individualized factors asserted here do not add up to a totality of circumstances analysis upon which reasonable suspicion can be found. "Zero plus zero will always equal zero. To conclude otherwise is to lend significance to 'circumstances [which] describe a very large category of presumably innocent travelers' and subject them to 'virtually random seizures.'" State v. Morgan, 539 N.W.2d 887, 897 (Wis. 1995) (Abrahamson, J., dissenting) (alteration in original) (quoting Reid v. Georgia, 448 U.S. 438, 441 (1980)).

In this case, Sergeant Horan, with his years of experience, had a hunch. That, however, is not the standard. The information Horan possessed did not amount to objectively reasonable and articulable suspicion, so the motion to suppress should have been granted.

## VI.

For the foregoing reasons, the decision in <u>State v. Nyema</u> is affirmed.

The decision in <u>State v. Myers</u> is reversed, Myers's conviction is vacated, and

the matter is remanded to the trial court for further proceedings consistent with

this opinion.


CHIEF JUSTICE RABNER and JUSTICES ALBIN, PATTERSON, FERNANDEZ-VINA, and SOLOMON join in JUSTICE PIERRE-LOUIS's opinion.