**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2262-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ANTHONY B. FORD,
a/k/a ANTHONY FORD,

     Defendant-Appellant.

_____

Argued December 8, 2021 – Decided September 9, 2022

Before Judges Gilson and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment Nos. 17-12-0574, 18-05-0294 and 19-02-0083.

Alyssa Aiello, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Alyssa Aiello, of counsel and on the briefs).

Elizabeth M. Newton, Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Elizabeth M. Newton, of counsel and on the brief).

PER CURIAM

After the motion judge denied his motion to suppress evidence seized without a warrant, defendant Anthony Ford entered a negotiated guilty plea to second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1).  In accordance with the terms of the plea agreement, defendant was sentenced to five years of imprisonment, with a forty-two-month period of parole ineligibility.  Defendant also received two concurrent prison terms of three years each for violating his probation on two unrelated convictions.  Pursuant to Rule 3:5-7(d), defendant now appeals the denial of his suppression motion.  Based on our review of the record and the applicable legal principles, we affirm.

We glean these facts from the testimony of Detective Freddy Jimenez, a member of the Trenton Police Department's Street Crimes Unit and the sole testifying witness at the suppression hearing conducted on June 28, 2019.

At approximately 4:00 p.m. on November 18, 2018, the Street Crimes Unit received a tip that defendant was sitting in front of 866 East State Street, a multi-unit residential building, "in possession of a silver and black handgun."  The tip came from a confidential informant (CI) who provided the information to a detective in the Mercer County Sheriff's Office.  The detective then relayed the

tip to the Sergeant of the Street Crimes Unit, who in turn shared the information with the rest of the unit, including Jimenez.

After briefly "strategiz[ing]," Jimenez and the rest of the unit, consisting of eight other detectives, headed to 866 East State Street. The unit members traveled in three unmarked police vehicles wearing "street crimes tactical gear," including outer vests with the word "police" inscribed in "bold" "reflective" letters on the front and back and "badges . . . on [their] chest[s]." The vehicles arrived in less than three minutes by exceeding the posted speed limit. Lights and sirens were not activated to avoid "alert[ing] anyone" of their approach.

As the unit approached the building, Jimenez, who was seated in a rear driver's-side seat, observed defendant from across the street. Jimenez had known defendant "since middle school" and described their relationship as "cordial." Jimenez had also worked in the area as a patrol officer and knew defendant had been previously arrested for firearms possession. Jimenez testified further that the building was located in a high-crime area and was "plagued by violent crimes involving illegal firearms, drug dealing, [and] things of that nature."

After Jimenez informed the other detectives in the car that he had spotted defendant sitting on the top step in front of the building, the vehicle quickly

3

veered across the oncoming traffic lane and headed directly toward the building. There was no oncoming traffic at the time. According to Jimenez, in the seconds when defendant noticed him in the approaching vehicle, defendant "became startled and began to stand up while manipulating something in his waistband." Jimenez explained that in his "experience" making "gun arrests, . . . the waistband [was] a common area for individuals to conceal firearms" and people "instinctively just grab" at their weapon to prevent it from falling out.

As Jimenez's vehicle came to "an angled stop" in front of the building, a second Street Crimes Unit car approached from the opposite direction and stopped in front of the building as well. When Jimenez exited his vehicle, defendant simultaneously stood and turned toward the building. As defendant attempted to enter the building, Jimenez "observed the silver part of [a] gun." Jimenez stated "the description given [by] the [CI] and [defendant's] reaction" to their approach "furthered [his] suspicion" that he had observed a handgun.

Jimenez yelled to defendant "to stop and drop the gun," but defendant disregarded the command, opened the unlocked door, and ran into the building. Jimenez "chased after" defendant, entering the building approximately three seconds later. Once inside, Jimenez saw defendant run down a common hallway, "drop the gun," and force his way into a first-floor apartment. Jimenez

immediately secured the handgun, "a silver revolver," and cleared it of five hollow-point bullets, while other unit members followed defendant into the apartment. Two detectives from the unit subsequently arrested defendant outside the building. During the search incident to the arrest, detectives discovered defendant was carrying a plastic bag containing suspected marijuana. Later, Jimenez learned defendant did not live in the first-floor apartment that defendant had entered during the chase.

During oral argument on the suppression motion, defendant argued the detectives lacked both reasonable suspicion to conduct an investigatory stop and probable cause to make a warrantless arrest. The State countered that Jimenez had probable cause to arrest defendant once he "saw the silver part of the handgun," given the CI's tip, as well as Jimenez's experience with armed suspects and knowledge of the high-crime nature of the area.

In an order entered on July 25, 2019, the judge denied defendant's motion. In an oral opinion, the judge found Jimenez's testimony "extremely credible" and uncontradicted, and determined that Jimenez reasonably believed defendant was carrying a handgun when he spotted him outside the building. Accordingly, the judge found Jimenez had "probable cause to arrest defendant and, therefore,

had lawful authority to pursue him into 866 East State Street, where they recovered the gun that he tossed in the common hallway."

The judge explained:

> [Detective] Jimenez, while on a public street, saw defendant holding what Jimenez reasonably believed was a handgun. Now, upon seeing the handgun . . . Jimenez, I find, had probable cause to arrest . . . defendant. This was more than a mere suspicion that defendant had committed a crime. The detective had actually seen . . . defendant holding a weapon and beginning to run away. Defendant pulled the object from his waistband, an area that . . . Jimenez knows is a common area to store guns, and this occurred in an area also known by . . . Jimenez to be one that's known for violent crime.
>
> The detective was also aware that . . . defendant had prior firearms arrests. At this point, . . . Jimenez had probable cause to believe that . . . defendant had committed the crime of unlawful possession of a firearm. Further, the detective had received a now corroborated tip from a [CI] further supporting that the silver object he saw was in fact a handgun.
>
> Objectively, it is perfectly reasonable that . . . Jimenez believed the object defendant was holding was a handgun. . . . Jimenez then pursued . . . defendant into the common area of 866 East State Street, where he observed . . . defendant discard the firearm.

Relying on State v. Smith, 37 N.J. 481 (1962), the judge also determined that Jimenez's warrantless entry into the building was permissible. In Smith, the Court held that "[a] policeman is not out-of-bounds when he is in the common

6

passageway of a multi-family house in the furtherance of an investigation." Id. at 496. Alternatively, the judge reasoned that even if Jimenez had not entered "a common area," the warrantless entry would still have been justified because "defendant fleeing on foot with a gun clearly created an exigent circumstance, placing lives in danger." Finally, the judge found the marijuana "was seized pursuant to a valid search incident to arrest."

After losing his suppression motion, defendant entered a guilty plea and was sentenced. His conviction was memorialized in a judgment of conviction (JOC) entered on December 12, 2019, and this appeal followed.[1]

On appeal, defendant raises the following point for our consideration:

> THE TRIAL COURT ERRED IN DENYING SUPPRESSION BECAUSE THE INFORMANT'S TIP DID NOT PROVIDE REASONABLE SUSPICION TO JUSTIFY THE SEIZURE THAT OCCURRED WHEN EIGHT DETECTIVES IN THREE POLICE VEHICLES CONVERGED ON FORD FROM DIFFERENT DIRECTIONS AS HE SAT ON THE STEPS OF A MULTI-UNIT ROWHOUSE.

"Our standard of review on a motion to suppress is deferential -- we 'must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record.'" State v.

---

[1] A corrected JOC on the violation of probation was entered on January 3, 2020.

Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Ahmad, 246 N.J. 592, 609 (2021)).  However, we owe no deference to "[a] trial court's interpretation of the law," and review "de novo" the "trial court's legal conclusions."  State v. Lamb, 218 N.J. 300, 313 (2014).

Both the Federal and State Constitutions guarantee the right of individuals to be free from unreasonable seizures by law enforcement.  U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  Under the Fourth Amendment, the seizure of a person involves "the application of physical force to the body of a person with intent to restrain" or "'submission to the assertion of authority.'"  Torres v. Madrid, 592 U.S. __, __, 141 S. Ct. 989, 995, 1003 (2021) (emphasis omitted) (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)).  However, our Supreme Court has adopted a broader view of what constitutes a seizure under Article I, Paragraph 7.  State v. Tucker, 136 N.J. 158, 165 (1994).

Under New Jersey law, a seizure may occur if under the totality of the circumstances, "the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."  Id. at 166 (quoting Florida v. Bostick, 501 U.S. 429, 439 (1991)).  Consequently, a fleeing suspect is not seized under the Fourth

A-2262-19

Amendment, <u>Hodari D.</u>, 499 U.S. at 625, but might be seized within the meaning of Article I, Paragraph 7, <u>Tucker</u>, 136 N.J. at 173.

Still, not every encounter with law enforcement is a seizure. <u>Ibid.</u> (observing that "[n]ot every police pursuit is a seizure"). For instance, a field inquiry is a voluntary interaction between an individual and law enforcement where "the police ask questions and do not compel [the] individual to answer." <u>State v. Rosario</u>, 229 N.J. 263, 271 (2017). "Because a field inquiry is voluntary and does not effect a seizure in constitutional terms, no particular suspicion of criminal activity is necessary on the part of an officer conducting such an inquiry." <u>Id.</u> at 272.

More intrusive encounters, however, generally constitute some form of seizure. <u>See id.</u> at 271. For example, an investigatory stop "is a temporary seizure that restricts a person's movement" and therefore "must be based on an officer's 'reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in, criminal activity.'" <u>Id.</u> at 272 (alteration in original) (quoting <u>State v. Stovall</u>, 170 N.J. 346, 356 (2002)). "Determining whether reasonable and articulable suspicion exists for an investigatory stop is a highly fact-intensive inquiry that demands evaluation of 'the totality of

circumstances surrounding the police-citizen encounter . . . .'" Goldsmith, 251 N.J. at 399 (quoting State v. Privott, 203 N.J. 16, 25 (2010)).

Further, "[a]n arrest – the most significant type of seizure by police – requires probable cause and generally is supported by an arrest warrant or by demonstration of grounds that would have justified one." Rosario, 229 N.J. at 272. "Although it is difficult to define the concept with precision, probable cause requires 'more than a mere suspicion of guilt' but less evidence than is needed to convict at trial." State v. Brown, 205 N.J. 133, 144 (2011) (quoting State v. Basil, 202 N.J. 570, 585 (2010)).

Defendant argues he "was illegally seized when, without reasonable suspicion, eight detectives in three police cars converged upon him from opposite directions." Defendant posits that because the act of discarding the gun was the direct result of the illegal seizure, the judge erred in denying his motion to suppress. Thus, the central question is whether defendant was seized before Jimenez saw the gun. If so, the police must have had reasonable suspicion or probable cause, or the gun and other recovered evidence would be inadmissible because "manifestations of police authority," unsupported by articulable suspicion or probable cause, may turn police actions into an unlawful seizure. Tucker, 136 N.J. at 173.

Indeed, as the Court explained in <u>Tucker</u>:

> "Property is not considered abandoned when a person throws away incriminating articles due to the unlawful actions of police officers." Thus, where a person has disposed of property in response to a police effort to make an illegal arrest or illegal search, courts have not hesitated to hold that property inadmissible.
>
> [<u>Id.</u> at 172 (quoting 1 Wayne R. LaFave, <u>Search and Seizure</u> § 2.6(b), at 471-72 (2d ed. 1987)).]

In <u>Goldsmith</u>, the Court recently identified when an investigatory stop commenced. 251 N.J. at 401. There, the trial court held the investigatory stop, which occurred on a walkway next to a vacant house, began when the officers asked the defendant for his identification and the defendant "reasonably believed he could not walk away at that point." <u>Ibid.</u> The Court disagreed, explaining that

> even before asking [the] defendant for identification, armed officers wearing tactical vests with "police" written on the front blocked the walkway as [the] defendant emerged, preventing [the] defendant from making forward progress, and began asking him questions about why he was there and from where he was coming. A reasonable person would not have felt free to leave at that point.
>
> [<u>Id.</u> at 401-02.]

In <u>Tucker</u>, the Court described the seizure of a defendant who fled after seeing an approaching police car as follows:

11

[A]lthough no evidence shows that the police commanded [the] defendant to halt or displayed any weapons, the officers immediately pursued him when he ran. The officers summoned assistance from a nearby patrol car to attempt to set up a blockade with the police cars on the streets at the front and rear of the yard when [the] defendant started to run away. As [the] defendant ran through the yard, he observed a police car closing in at the front yard. [The d]efendant reversed his direction. However, an officer approached him from the back yard. Surely [the] defendant could not have felt free to leave. Such police actions would cause a reasonable person to believe that the police wanted to capture him and not just to speak with him.

[136 N.J. at 166.]

In State v. Caldwell, 158 N.J. 452 (1999), police officers attempted to stop a defendant outside a multi-unit dwelling on the mistaken belief that the defendant had an outstanding warrant. When the defendant saw the unmarked police vehicle approaching, he turned and ran into the building. Id. at 455. The Court ultimately concluded the defendant was not seized until the officers commanded him to halt inside the building. Id. at 459.

The Court explained:

When [the] defendant saw the unmarked police car approaching, he turned, looked at them, and ran into the building. The officers exited the vehicle and ran toward the building. [The d]efendant ran up the front steps and was a quarter of the way down the hallway when [the detective] yelled, "stop, police, . . . don't run any more."

12

. . . .

> . . . Unquestionably, the officers intended to attempt an investigatory stop of the black male that they observed in front of 86 Butler Street . . . . <u>Before any attempt at an investigatory stop occurred</u>, [the defendant] turned and ran into the building and down the hallway, pursued by the officers, and stopping only after [the detective] shouted "stop, police, . . . don't run any more." It is clear that when the officers chased [the] defendant into the building, commanding him to "stop," a seizure of [the] defendant occurred . . . .

> [<u>Id.</u> at 455, 459 (emphasis added).]

Here, the evidence established that defendant was not seized in the moments before Jimenez saw the gun. First, we note that mere seconds passed between defendant seeing the police approaching and Jimenez seeing the silver part of the gun in defendant's hand. Also, defendant was already turning toward the building and manipulating the gun in his waistband before the police vehicles came to a complete stop.

Unlike other cases where seizures occurred after police had time to block a defendant's path or otherwise engage in pursuit, defendant urges us to find he was seized the instant he noticed the detectives approaching in their vehicles. We decline the invitation. <u>See</u> <u>Goldsmith</u>, 251 N.J. at 401; <u>Tucker</u>, 136 N.J. at 166; <u>Rosario</u>, 229 N.J. at 266-67 ("The officer positioned his patrol car perpendicularly behind [the] defendant's to box in [her] car . . . ."). While

13

Jimenez and the other members of the unit undoubtedly intended to conduct an investigatory stop, a reasonable person would not have believed he was not free to leave the second he saw police vehicles turn toward the building. See Caldwell, 158 N.J. at 459.

Because we agree with the judge that Jimenez had probable cause to arrest defendant upon observing the gun, we conclude Jimenez was authorized to pursue defendant into 866 East State Street and recover the gun defendant tossed in the common hallway. See Smith, 37 N.J. at 496. We also point out that the exigent circumstances found by the trial judge in this case justified the police officers entering the building to pursue defendant, whom the officers had grounds to believe was armed with a gun. Accordingly, the facts of this case are distinguishable from the facts in State v. Bookman, __ N.J. __ (2022). In Bookman, the Court recognized that "[t]he hot pursuit of a fleeing suspect may constitute an exigent circumstance sufficient to justify a warrantless home entry if the officers are in 'immediate or continuous pursuit' of the suspect." Id., slip op. at 15 (quoting State v. Bolte, 115 N.J. 579, 597-98 (1989)). Thus, we are satisfied defendant's suppression motion was properly denied.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2262-19