**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2907-20

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARVIN PULLIAM, a/k/a
MARVIN GOLDEN, ASLAMA
GOLDEN, MARV PULLIAM,
MARVIN L. PULLIAM, and
MARVIN PULLIAN,

    Defendant-Appellant.

_____

Submitted April 26, 2022 – Decided October 3, 2022

Before Judges DeAlmeida and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 19-06-0675.

Joseph E. Krakora, Public Defender, attorney for appellant (Zachary Markarian, Assistant Deputy Public Defender, of counsel and on the brief).

Esther Suarez, Hudson County Prosecutor, attorney for respondent (Colleen Kristan Signorelli, Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

DeALMEIDA, J.A.D.

Defendant Marvin Pulliam appeals from the August 26, 2020 order of the Law Division denying his motion to suppress evidence, which was followed by a May 28, 2021 judgment of conviction of two counts arising from defendant possessing a gun and pointing it at a person on a public street. We affirm.

I.

At about 4:30 p.m. on March 28, 2019, two Jersey City police officers were at a police station when they heard a dispatch that shots had been fired at the intersection of Grant Avenue and Martin Luther King, Jr. Boulevard, a few blocks away. They got into a marked patrol car driven by officer Aguilar and proceeded north on Bergen Avenue toward Grant Avenue.

On Bergen Avenue between Bostwick Avenue and Myrtle Avenue, about one block from the scene of the shooting, a man driving south in a green van "waved down" the officers. Aguilar stopped the patrol car and briefly spoke to the man while both remained in their vehicles. The man, who did not identify himself, said "the guy's coming up the block, the guy's coming up the block." He described the individual as a black male wearing a blue hoodie and pointed

toward the intersection of Myrtle Avenue and Bergen Avenue. The officers obtained no further information from the man.

Aguilar immediately transmitted the information he received from the man over the radio, saying that an individual coming down Myrtle Avenue "might be involved in it," although the man had not expressly identified the person in the blue hoodie as having been involved in the shooting. He then observed a black male, later identified as defendant, wearing a "dark navy sweater" and "another jacket on top of him with a hood" walking on Myrtle Avenue toward Bergen Avenue. Aguilar believed defendant might have been involved in the shooting because he matched the description given by the man in the van.

The officers, who were in uniform, exited the patrol car and ordered defendant to stop. Defendant instead ran through the backyard of a nearby building. The officers pursued defendant on foot before apprehending him in the backyard.

Shortly thereafter, a person on the fire escape of a nearby building shouted to the officers. He said that something was "right here, it's over here, it landed over here, I heard a thump, it landed over here" and pointed toward an object on the ground. Aguilar walked to the location to which the person was pointing

3

and observed a handgun on Myrtle Avenue near the sidewalk. The officers arrested defendant.

A grand jury indicted defendant, charging him with first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3(a)(1) and (2); second-degree possession of a firearm without a permit, N.J.S.A. 2C:39-5(b)(1); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); third-degree receiving stolen property, N.J.S.A. 2C:20-7(a); fourth-degree reckless risking of widespread injury or damage, N.J.S.A. 2C:17-2(c); fourth-degree obstruction of the administration of law, N.J.S.A. 2C:29-1(a); fourth-degree resisting arrest by flight, N.J.S.A. 2C:29-2(a)(2); and second-degree possession of weapon by a certain person, N.J.S.A. 2C:39-7(b)(1).

Defendant moved to suppress the evidence obtained as a result of his arrest, arguing that Aguilar lacked reasonable suspicion of criminal activity to permit the officer to stop him.

After an evidentiary hearing, the trial court denied the motion. In a written opinion, the court found that the officers conducted an investigatory stop of defendant under Terry v. Ohio, 392 U.S. 1 (1968), and State v. Stovall, 170 N.J. 346 (2002). The court found that Aguilar reasonably inferred from the statement

A-2907-20

of the man in the van that he was identifying someone involved in the nearby shooting and that

> [a]lthough on its face the clothing worn by [d]efendant does not exactly match the description originally provided by the unidentified individual, this [c]ourt, having had the opportunity to hear Aguilar's testimony and finding it to be credible, finds that the officer was interchanging "sweater" and "hoodie" as one in the same.
>
> . . . .
>
> The difference between a hoodie, sweater and hooded sweater appears semantic to this [c]ourt. It is not as though the officer called out about someone in a ski jacket and then stopped someone in a knitted sweater, nor is it as though the officer called about someone in a blue sweater and stopped someone in a red sweater.

Thus, the trial court concluded, the officers had a reasonable suspicion that defendant had committed a crime associated with the nearby shooting sufficient to justify an investigatory stop. An August 26, 2020 order memorializes the trial court's decision.

Defendant, pursuant to an agreement, later entered a guilty plea to fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(4), a lesser included offense of attempted murder, and second-degree possession of weapon by a certain person. The court dismissed the remaining counts of the indictment and sentenced defendant to an aggregate five-year term of imprisonment without parole.

A-2907-20

This appeal followed.  Defendant makes the following argument.

> POLICE LACKED REASONABLE SUSPICION TO STOP PULLIAM BASED SOLELY ON KNOWLEDGE SHOTS HAD BEEN FIRED IN THE AREA AND AN ANONYMOUS CITIZEN'S REPORT THAT A BLACK MAN IN A BLUE SWEATER WOULD BE COMING AROUND THE CORNER.

II.

Both the federal and state constitutions protect citizens against unreasonable searches and seizures.  See U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  The parties agree that Aguilar's encounter with defendant was an investigatory stop, which constitutes a seizure under both the federal and state constitutions.  An investigatory stop or detention, sometimes referred to as a Terry stop, involves a temporary seizure that restricts a person's movement.  A Terry stop implicates a constitutional requirement that there be "'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity."  State v. Elders, 192 N.J. 224, 247 (2007) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)).  The State has the burden to establish that a stop was valid.  State v. Mann, 203 N.J. 328, 337-38 (2010); State v. Pineiro, 181 N.J. 13, 20 (2004).  If there was no reasonable suspicion of criminal activity to justify the stop, evidence

A-2907-20

discovered as a result of the stop is subject to exclusion. State v. Chisum, 236 N.J. 530, 546 (2019).

To determine whether reasonable suspicion existed, a judge must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation. State v. Nelson, 237 N.J. 540, 554-55 (2019) (quoting Stovall, 170 N.J. at 361). Investigatory stops are justified "if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur." State v. Davis, 104 N.J. 490, 505 (1986).

> A [judge] must first consider the officer's objective observations. The evidence collected by the officer is "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement. [A] trained police officer draws inferences and makes deductions . . . that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities." Second, a [judge] must determine whether the evidence "raise[s] a suspicion that the particular individual being stopped is engaged in wrongdoing."
>
> [Id. at 501 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)) (alterations in original).]

"[A]n appellate court reviewing a motion to suppress must uphold the factual findings underlying the trial court's decision so long as those findings

A-2907-20

are supported by sufficient credible evidence in the record." Elders, 192 N.J. at 243 (quotations omitted). We disregard only those findings that "are clearly mistaken." State v. Hubbard, 222 N.J. 249, 262 (2015). We review legal conclusions of the trial court de novo. State v. Watts, 223 N.J. 503, 516 (2015).

Defendant argues that the vague and generic information provided to Aguilar by an unnamed member of the public and the officer's failure to observe suspicious activity on defendant's part before stopping him, fall short of the specific and articulable facts necessary to justify a Terry stop. The State counters that Aguilar acted reasonably because, while responding to a dangerous emergency situation, he received sufficiently specific information from a member of the public, including a description of the suspect's clothing, justifying an investigatory stop of defendant.

We begin our analysis with the meaning and reliability of the statement made to Aguilar by the man in the van. "Generally speaking, information imparted by a citizen directly to a police officer will receive greater weight than information received from an anonymous tipster." State v. Basil, 202 N.J. 570, 586 (2010). "Thus, an objectively reasonable police officer may assume that an ordinary citizen reporting a crime, which the citizen purports to have observed, is providing reliable information." Ibid. This is so because "we assume that an

ordinary citizen 'is motivated by factors that are consistent with law enforcement goals,'" ibid. (quoting Davis, 104 N.J. at 506), and thus may be regarded as trustworthy. State v. Hathaway, 222 N.J. 453, 471 (2015). In addition, when an ordinary citizen gives information in person, "an officer can observe the informant's demeanor and determine whether the informant seems credible enough to justify immediate police action without further questioning . . . ." Basil, 202 N.J. at 586. Information received from a citizen "concerning a criminal event would not especially entail further exploration or verification of his personal credibility or reliability before appropriate police action is taken." Hathaway, 222 N.J. at 471 (quoting Davis, 104 N.J. at 506).

In each of these precedents, our Supreme Court found that the anonymous report of criminal activity by an ordinary citizen, when considered in context with other facts, was sufficient to give law enforcement personnel authority to enter a premises under the emergency aid exception to the warrant requirement, see State v. Frankel, 179 N.J. 586, 598 (2004), effectuate an arrest based on probable cause, or conduct a Terry stop. A critical element of the Court's analysis in each case was that the anonymous citizen reported criminal acts based on personal knowledge.

For example, in <u>Basil</u>, the victim of a crime, who refused to identify herself out of fear for her safety, approached an officer when he arrived at the scene and said that Basil had pointed a shotgun at her before tossing the weapon under a nearby car.  202 N.J. at 587.  Her statement was based on "information from her personal knowledge regarding events that occurred minutes earlier." <u>Ibid.</u>  "Importantly, the young woman's reliability was immediately corroborated by the discovery of the shotgun in the precise location where she said it was discarded."  <u>Ibid.</u>  The Court found that the citizen's corroborated report gave the officer probable cause to arrest Basil.  <u>Ibid.</u>

Similarly, in <u>Hathaway</u>, at approximately 4:00 a.m., the "animated" and "upset" victim of an armed robbery approached casino security personnel and reported that he had been robbed at gunpoint and forced to disrobe in his hotel room.  222 N.J. at 461.  A few minutes later, the victim left the casino without revealing his identity.  <u>Ibid.</u>  The security official viewed a surveillance video that confirmed that the victim had arrived at a specific hotel room with two men and two women, and left alone in what appeared to be a panic shortly before giving his report of having been robbed.  <u>Id.</u> at 462.  The security official relayed this information, and his observation that the gunmen and two women may still be in the room, to a law enforcement officer.  <u>Ibid.</u>  The Court found that the

officer had no objectively reasonable basis to doubt the victim's report, id. at 476, and an objectively reasonable basis to believe that an emergency required him to enter the hotel room without a warrant. Id. at 476-79.

In Davis, a member of the local first aid squad called 9-1-1 to report that he observed two men on bicycles "hanging around" a closed gas station just before midnight. 104 N.J. at 494. Based on that information, an officer, who found no one at the gas station, searched for the suspects in his patrol car. Id. at 495. About three blocks from the station, the officer encountered two men on bicycles riding against traffic, whom he stopped pursuant to Terry. Ibid. Ultimately, the two men admitted that they had stolen the bicycles. Id. at 496. The Court found that a member of a first aid squad "while not part of the government, is more involved and presumably more public spirited than the average citizen." Id. at 506. Thus, the Court found, "[t]he police could . . . rely on him as a credible source of information." Ibid. The Court concluded the report "furnished [a] sufficient basis for the police to investigate whether criminal activity had occurred or was about to occur," justifying a Terry stop. Ibid.

Here, the citizen's statement to the officer – "the guy's coming up the block, the guy's coming up the block" – does not convey a report of criminal

activity. Nor does the report, on its face, indicate that it is based on the citizen's personal observations. The trial court found, however, that in light of the circumstances in which the report was made, Aguilar reasonably interpreted the statement as a report that the citizen had personal knowledge that someone involved in the shooting approximately a block away was fleeing the scene via Myrtle Avenue. Given the proximity of the officer's interaction with the citizen to the reported shooting scene, the exigency of the circumstances, and the absence of any other explanation for the citizen's report, we conclude there is sufficient support in the record for the trial court's finding regarding the objective reasonableness of Aguilar's interpretation of the man's statement as a report of criminal activity.[1]

Moments later, Aguilar saw a person reasonably matching the description given by the citizen – a black man in a blue hoodie – moving away from the scene of the shooting in the direction and on the street reported by the citizen. Although defendant's clothing was not an exact match to what the citizen described, we see no basis to reverse the trial court's conclusion that the

---

[1] Although defendant accurately notes that the record does not contain evidence of the amount of time that passed between the shooting, the report of the shooting to the police, and the dispatch that triggered Aguilar's immediate response, nothing in the record suggests that Aguilar was under the impression that anything other than exigent circumstances existed.

A-2907-20

difference between a blue hoodie and a blue sweater with a hooded jacket over it is not meaningful in this context. The officer's observation of defendant corroborated the citizen's report in several respects, bolstering the reasonableness of the Terry stop.

We do not agree with defendant's argument that the holdings in State v. Shaw, 213 N.J. 398 (2012), and State v. Caldwell, 158 N.J. 452, 460 (1999), control the outcome here. In Shaw, an officer searching for Shaw, a fugitive, knew only that he was black and male. 213 N.J. at 403. When the officer saw two black males walking away from a multi-unit apartment building where he suspected Shaw would be found, he stopped both men, one of whom was Shaw. Id. at 403-04. The stop was based on nothing more than the race and gender of the men stopped. Id. at 411. The officer ultimately arrested Shaw and found heroin in his waistband. Id. at 405. The Court invalidated the arrest, concluding that the officer "had no objective basis to believe that Shaw was anyone other than a random person walking out of a residential apartment building," and, as a result, had no basis to conduct a Terry stop. Id. at 411-12.

Similarly, in Caldwell, officers went to an apartment building to arrest someone who they believed to be a fugitive. 158 N.J. at 454-55. The only information they had about the fugitive was that he was a black male. Id. at 455.

As they arrived in front of the building, the officers saw a black male standing alone outside. Id. at 455. When the man ran into the building, the officers followed him and, ultimately, arrested him. Id. at 455-56. In the course of the arrest, the officers discovered cocaine. Id. at 456. The man, Caldwell, was not the fugitive sought by the officers.

The Court invalidated the arrest, concluding that it was "evident that the police did not have sufficient information to justify" their pursuit and detention of Caldwell. Id. at 460. Noting that the officers had no information concerning the fugitive's "height, weight. . . clothing" or "distinguishing characteristics," the Court held that the race and gender of the individual sought was insufficiently precise to allow for the seizure of Caldwell. Ibid. Otherwise, the Court explained, "police could theoretically conduct wide-ranging seizures on the basis of vague general descriptions." Ibid.

Aguilar stopped defendant based on more information than his race and gender. The officer reasonably interpreted the citizen's comments as a report that a black male in a blue hoodie was involved in a shooting that had just transpired and was fleeing the scene via Myrtle Avenue. The officer then saw a black male in sufficiently similar clothing traversing Myrtle Avenue coming from the direction of the shooting. These circumstances are distinct from those

14

before the Court in <u>Shaw</u> and <u>Caldwell</u>. The clothing match corroborated the citizen's report, as did the contemporaneous appearance of defendant on Myrtle Avenue. The potentially dangerous situation was fluid. Aguilar was required to make a split-second decision in the aftermath of an afternoon shooting on a public street, just a block from where he spotted defendant.

Nor do we view the Court's opinion in <u>State v. Nyema</u>, 249 N.J. 509 (2022), issued after the parties submitted their briefs in this matter, to require a different outcome. In <u>Nyema</u>, police received a dispatch that two black males, one with a gun, had robbed a convenience store. <u>Id.</u> at 516. An officer driving to the scene saw, when he was approximately three-quarters of a mile from the store, cars approaching from the opposite direction. <u>Ibid.</u> Using a spotlight mounted on the patrol car, the officer illuminated the interior of the approaching vehicles. <u>Id.</u> at 516-17. The occupants of the second car, three black males, did not respond to the light, looking straight ahead. <u>Id.</u> at 517. This contrasted with the reaction of the occupants of the first vehicle, who demonstrated "alarm or annoyance" at the light. <u>Ibid.</u> The officer stopped the second vehicle, which contained the defendant. <u>Ibid.</u> The occupants were arrested for possession of a stolen vehicle and were later charged with robbery of the store. <u>Id.</u> at 518.

The Court found that the information possessed by the officer at the time of the stop did not constitute reasonable suspicion of criminal activity.  Id. at 531.  As the Court explained,

> [c]ertainly, race and sex – when taken together with other, discrete factors – can support reasonable and articulable suspicion.  But here, the initial description did not provide any additional physical descriptions such as the suspects' approximate heights, weights, ages, clothing worn, mode of transportation, or any other identifying feature that would differentiate the two Black male suspects from any other Black men in New Jersey.  That vague description, quite frankly, was "descriptive of nothing."
>
> [Id. at 531 (quoting Caldwell, 158 N.J. at 468 (Handler, J., concurring)).]

The Court continued,

> [i]f that description alone were sufficient to allow police to conduct an investigatory stop of defendants' vehicle, then law enforcement officers would have been permitted to stop every Black man within a reasonable radius of the robbery.  Such a generic description that encompasses each and every man belonging to a particular race cannot, without more, meet the constitutional threshold of individualized reasonable suspicion.
>
> [Id. at 531-32.][2]

---

[2]  The Court subsequently discounted the relevancy of the absence of reaction of the occupants of the car to the spotlight's glare.  Id. at 533-34.

Although the question is a close one, we see the citizen's report of the clothing worn by the man fleeing the scene of the shooting, along with his description of his direction of travel and the block on which he was travelling, to be sufficient to distinguish the circumstances before this court from those before the Court in <u>Nyema</u>. Based on the information received from the citizen, Aguilar could not theoretically have stopped every black man in New Jersey or within a reasonable radius of the shooting. The officer possessed reliable information describing details distinguishing the suspect from other black men in the area.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2907-20